LA BARGE, Plaintiff in error, v. STATE, Defendant in error.

*No. 75–563–CR.  Argued October 6, 1976.—*
*Decided November 16, 1976.*
(Also reported in 246 N. W. 2d 794.)

For the plaintiff in error there was a brief and oral argument by *Howard B. Eisenberg,* state public defender.

For the defendant in error the cause was argued by *Betty R. Brown,* assistant attorney general, with whom on the brief was *Bronson C. La Follette,* attorney general.

HEFFERNAN, J. The defendant, Jerry A. La Barge, was found guilty by a jury of injury by conduct regardless of life contrary to sec. 940.23, Stats. He was sentenced to a term not to exceed four years at the Green Bay Reformatory on July 8, 1975. Postconviction motions were denied on November 25, 1975. The writs of error are directed to the judgment of conviction and the order denying postconviction relief.

The State Public Defender attacks the conviction on three grounds. It is argued that the statute under which the defendant was charged, sec. 940.23, Stats., is inapplicable to the present situation, since the victim did

not sustain "great bodily harm," as such injury is defined in sec. 939.22(14), but only superficial injuries.

It is also contended that the use at trial of testimony elicited at the preliminary hearing was permitted by the trial court without sufficient evidence of due diligence on the part of the state to produce the witness, and that, therefore, the defendant was denied the right of confrontation guaranteed by the constitutions of the United States and of the State of Wisconsin.

Additionally, it is argued that hearsay testimony implicating the defendant was improperly admitted into evidence, where the facts did not show a proper foundation for its admission as an "excited utterance."

After a perusal of the record, we conclude that each of these assertions is unfounded, and accordingly we affirm.

The record shows that on February 15, 1975, the defendant La Barge and Merilee Maulson were living together. This relationship was apparently of long standing, for the record indicates that Jerry La Barge was the father of one of Merilee's children. Because of altercations between the two, Merilee concluded that she was going to leave the defendant and return to Chicago with their child. An argument followed; and, at some time, according to the testimony of Merilee Maulson, the defendant produced a butcher knife, threatened to kill her, and stated, "I'll cut your face up so nobody else will want you." There is evidence to show that he then cut and stabbed her.

Louise Vetterneck testified at trial that when she came to the door to pick up Merilee to drive her to Chicago, she heard Merilee "hollering." The door was locked, and she was unable to get in. Vetterneck then went to get the police, who were parked a short distance away. She stated that, when she returned within five minutes, Merilee Maulson was running from the house.

Vetterneck stated that she picked up Merilee within 20 or 30 feet down the road, got her into the car, and took her to the hospital. Vetterneck said she could see cuts on Merilee's face and ear and that she was covered with blood.

Shortly after getting into the Vetterneck car, Merilee said, "Jerry did this to me." It was this statement by Maulson which Vetterneck was permitted to recount at the trial.

At the trial the physician who treated Merilee testified that he sutured six lacerations and six stab wounds. The stab wounds varied in depth from one to three and one-half inches. He testified that Merilee Maulson had sustained a number of other lacerations, but only 12 wounds required suturing. He was unable to state how many additional wounds were inflicted. He stated that he probed the wounds and was unable to determine initially whether any internal organs had been penetrated.

Merilee was hospitalized for six days, primarily for the purpose of determining whether any complications would ensue that would indicate the penetration of internal organs. No complications arose, and accordingly the physician testified at trial that no internal organs were penetrated. He stated that at no time was she in imminent danger of death, that her blood pressure was normal, and that she required no transfusions. He did state, however, that extensive suturing was necessary to close the wounds. He gave the opinion that some scarring would surely result, but in view of the fact that he did not examine her subsequent to her original hospitalization, he was unable to testify to any permanent disfigurement.

The State Public Defender contends that the injuries sustained by Merilee did not constitute "great bodily harm," within the meaning of the Criminal Code. Sec. 940.23, Stats., provides:

"Injury by conduct regardless of life. Whoever causes great bodily harm to another human being by conduct imminently dangerous to another and evincing a depraved mind, regardless of human life, may be imprisoned not more than 10 years."

"Great bodily harm" is defined by sec. 939.22(14), Stats.:

" 'Great bodily harm' means bodily injury which creates a high probability of death, or which causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ or other serious bodily injury."

The State Public Defender relies primarily upon the rationale of *State v. Bronston* (1959), 7 Wis.2d 627, 97 N.W.2d 504, 98 N.W.2d 468. In *Bronston,* the defendant was found guilty of aggravated battery under the then existing statute, sec. 940.22, Stats. (1957), which described that offense as "intentionally caus[ing] great bodily harm to another." "Great bodily harm" was defined in 1957 exactly as now. In *Bronston,* the victim sustained a two-inch laceration to the scalp that required four sutures to close. The court concluded in *Bronston* that, as a matter of law, the injuries there sustained did not constitute "great bodily harm."

It reached that conclusion by the invocation of two commonly accepted rules of statutory construction: The first, that penal statutes are to be interpreted strictly against the state and in favor of the accused; and, the second, that the canon of statutory interpretation, *ejusdem generis,* was applicable. It concluded that the relatively minor injuries sustained by the victim in *Bronston* were not in the same category or of the same kind as the enumerated injuries which created a high probability of death, permanent disfigurement, or the loss or impairment of an organ or bodily function. There is no disagreement with the conclusion the court reached in *Bronston.*

Our study of the legislative history of the particular statute leads, however, to the conclusion that the phrase, "or other serious bodily injury," was designed as an intentional broadening of the scope of the statute to include bodily injuries which were serious, although not of the same type or category as those recited in the statute.

■ When a statute is passed which enumerates several specific items encompassed in the purview of the statute and then follows the specifics with a general phrase, it is reasonable to conclude that the general phrase was intended to cover only other items that fall within the general category of those enumerated. In respect to such a statute, the proper resolution of the problem of interpretation is set forth in Sutherland, *Statutory Construction* (4th ed.), sec. 47.17, p. 104:

"The resolution of this conflict by ascribing to the series its natural meaning and by restricting the meaning of the general words to things ejusdem generis with the series is justified on the ground that had the legislature intended the general words to be used in their unrestricted sense, it would have made no mention of the particular words, but would have used 'only one compendious' expression."

However, as stated in that same treatise, that approach is not without exception. Sutherland states, sec. 47.22, p. 118:

"A final qualification on the doctrine is that the general words are not restricted in meaning to objects ejusdem generis if there is a clear manifestation of a contrary intent or purport."

In *United States v. Baranski* (7th Cir. 1973), 484 F.2d 556, the court of appeals declined to apply *ejusdem generis* to a statute knowingly hindering or interfering or attempting to interfere with government property "by force or violence *or otherwise.*" (Emphasis sup-

plied.) The court concluded, after studying the statutory history, that the phrase "or otherwise" had been added by amendment. It concluded that, where the general phrase was not a part of the original statute but was subsequently added, the Congress intended the added phrase to have a distinct meaning, and must have intended to broaden the scope of the statute. *Gooch v. United States,* 297 U.S. 124 (1936), and *United States v. Alpers,* 338 U.S. 680 (1950), follow the same rule where the catch-all phrase has been added by a subsequent amendment.

The legislative history of sec. 939.22 (14), Stats., shows that the definition of "great bodily harm" has undergone precisely that type of amendment. "Great bodily harm" appeared in the Criminal Code for the first time in ch. 623, Laws of 1953, effective July 1, 1955, and was defined in sec. 339.22 (12). That definition did not contain the last phrase that now appears in the statute. The phrase, "or other serious bodily injury," was added to the definition by the Laws of 1955, ch. 696, effective July 1, 1956. The original definition, hence, was in effect for one year prior to the time the amendment became effective.

A review of the minutes of the interim action of the Legislative Council Committee considering the revision of the Criminal Code bears out the conclusion that the phrase, "other serious bodily injury," was intended to broaden the type of injury that was to be encompassed in the definition. The minutes of the meeting of April 30, 1954, reveal a discussion of the definition with which we are concerned. Judge Steffes, a member of the Legislative Council, stated his objection to the definition of "great bodily harm" as it appeared in the Code and said that he believed that it should include "serious personal injury." At a later session of the Council Committee on the motion of Assistant Attorney General Wil-

liam Platz, the phrase, "or other serious bodily injury," was adopted and was subsequently incorporated in the Code as it was passed by ch. 696 of the Laws of 1955.

In view of this history, of which we take judicial notice, it is apparent that the added phrase had a distinct meaning which was intended to broaden the scope of the statute. The 1955 amendment was intended to broaden the scope of the statute and was intended to include serious bodily injury of a kind not encompassed in the specifics of the original statute. To hold otherwise would be to conclude that the action of the legislature in 1955 was meaningless surplusage.

Accordingly, the *ejusdem generis* rationale of *Bronston* is overruled. When this possibility was posed in oral argument, the State Public Defender, representing La Barge in this case, appeared to contend that, in view of the uniform interpretation placed upon this statute since *Bronston,* it would be improper at this late date—more than twenty years after the passage of the legislation in question—to hold that the legislature intended other than that which was found in *Bronston.* We point out, however, that a criminal statute is not in the same category as those statutes which confer vested rights of property and upon whose interpretation lawyers and litigants are entitled to rely. It cannot be said that La Barge placed any reliance upon the prior interpretation of the statute when he committed the acts that are involved in this case.

The trial judge in the instant case concluded, correctly we believe, that under the record it was a matter of fact for the jury to determine whether the injuries inflicted upon Merilee Maulson constituted "other serious bodily injury."

As the state points out in its brief, citing *State of Arizona v. Perry,* 5 Ariz. App. 315, 317–318, 426 P.2d 415 (1967):

"[T]he words 'serious bodily injury' are words of ordinary significance, and . . . they are well understood by any jury of ordinary intelligence."

The record in this case shows that Merilee Maulson sustained numerous stabs and wounds, that 12 of them required suturing, and that approximately 100 inches of suture material was required to close the wounds. In addition, she sustained a number of minor cuts, abrasions, and bruises which did not require suturing. While at no time was there a probability of death, and the course of events showed that no internal organs were penetrated, hospitalization for six days was required. The evidence of the witnesses, including Doctor Hiatt, who treated the victim shortly after the attack, was replete with evidence of the considerable amount of blood which was lost.

We conclude that, under the facts of this case, the jury could reasonably conclude that the multiple cuts and stab wounds of Merilee Maulson constituted "serious bodily injury." The evidence was sufficient beyond a reasonable doubt to sustain the verdict finding the defendant guilty of the violation of sec. 940.23, Stats.

It is also argued on this appeal that the court improperly admitted the preliminary-hearing testimony of Merilee Maulson at trial. It is argued that the state failed to use due diligence to secure Merilee's personal presence and testimony.

Merilee Maulson's testimony was admitted under sec. 908.045(1), Stats.:

"908.045 Hearsay exceptions; declarant unavailable. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

"(1) Former Testimony. Testimony given as a witness at another hearing of the same or a different proceeding, or in a deposition taken in compliance with law in the course of another proceeding, at the instance of or against a party with an opportunity to develop

the testimony by direct, cross-, or redirect examination, with motive and interest similar to those of the party against whom now offered."

That hearsay exception applies, however, only to a witness who is "unavailable." "Unavailability" is defined in sec. 908.04, Stats. Sec. 908.04(1)(e) is the subsection pertinent here. Sub. (e) applies when the declarant:

"Is absent from the hearing and the proponent of his statement has been unable to procure his attendance by process or other reasonable means."

The Judicial Council comment to this section of the statute states:

"Diligent attempts to procure attendance of the witness as a condition to invoking the concept of unavailability have been required by Wisconsin cases whether considered a confrontation matter in a criminal case, *State v. La Fernier*, 44 Wis.2d 440, 171 N.W.2d 408 (1969), or a former testimony exception to the hearsay rule in a civil case . . . ." 59 Wis.2d R305.

In *La Fernier*, cited by the Judicial Council, this court extensively discussed the requirement of "due diligence" and equated that Wisconsin requirement with the requirement of "good-faith effort" discussed and required by the United States Supreme Court in *Barber v. Page*, 390 U.S. 719 (1968). *La Fernier* and *Barber* both require that the prosecutorial authorities make a good-faith effort to obtain the witness' presence at a trial before he can be declared "unavailable" and the former testimony used.

In this case, Merilee Maulson was extensively questioned at the preliminary hearing in regard to the attack upon her by Jerry La Barge. Unlimited cross-examination was permitted, and our search of the record reveals that counsel for La Barge was permitted to fully cross-examine Merilee without any objections from

either the court or the prosecutor. It appears that Merilee's prior testimony at the preliminary examination falls squarely within the hearsay exception recognized in *Barber v. Page, supra,* at 725–726, wherein the United States Supreme Court stated:

"The right to confrontation is basically a trial right. It includes both the opportunity to cross-examine and the occasion for the jury to weigh the demeanor of the witness. A preliminary hearing is ordinarily a much less searching exploration into the merits of a case than a trial, simply because its function is the more limited one of determining whether probable cause exists to hold the accused for trial. While there may be some justification for holding that the opportunity for cross-examination of a witness at a preliminary hearing satisfies the demands of the confrontation clause where the witness is shown to be actually unavailable, this is not, as we have pointed out, such a case."

In *California v. Green,* 399 U.S. 149 (1970), the United States Supreme Court upheld the introduction of preliminary-hearing testimony at trial. It thus seems clear that a preliminary hearing at which cross-examination is permitted satisfies the prior-testimony test of the hearsay exception.

Additionally, however, the State Public Defender argues that due diligence was not used to secure the presence of Merilee Maulson at trial, and hence she was not unavailable.

The record shows that, after Merilee testified at the preliminary, she left for Chicago and was out of the state at the time the trial was scheduled. The preliminary examination was held on February 21, 1975, and the trial was set for June 18, 1975. On May 20, 1975, the state commenced formal proceedings to secure the return of Merilee Maulson under the provisions of the Uniform Act for the Extradition of Witnesses in Criminal Actions.

When it appeared that Merilee Maulson could not be produced at the trial, the prosecutor moved for the admission of her preliminary-hearing testimony. The court declined to permit the admission of that testimony in the absence of a showing of due diligence. A hearing was held, at which the District Attorney's secretary testified that the appropriate papers for the extradition of the witness had been properly transmitted to the Cook County District Attorney's office in May. The District Attorney's secretary testified that, several days prior to trial, she attempted to speak with the Cook County extradition officer but was unable to reach him. On June 16, 1975, she was advised by the Cook County District Attorney's office that Merilee Maulson was to appear that afternoon in response to a subpoena. On June 18, the day that the trial opened, a teletype was received from the Cook County authorities stating that Merilee Maulson had failed to appear in response to the subpoena, that a warrant had been issued for her arrest, and that they had been unable to locate her. The evidence showed that all the information that the prosecuting attorney's office had in respect to Merilee Maulson's whereabouts was timely furnished to the Chicago authorities. On the basis of this evidence of the efforts of the prosecution to secure the physical presence of Merilee Maulson, the trial judge concluded that due diligence had been used and ordered that the preliminary-hearing testimony be admitted into evidence.

In *State v. Le Fernier, supra,* we stated:

"The trial court's decision concerning the admissibility of prior trial testimony is a matter of discretion, and thus this court must decide whether such decision constituted an abuse of discretion." (At 446)

The facts adduced at the hearing show that appropriate proceedings for extradition were begun a month before trial. A subpoena was issued in Illinois and a search was conducted for her there and also in Vilas

county. When it appeared that she probably could not be produced by the Chicago authorities, the Vilas county district attorney's office energetically followed up on the extradition proceedings. An arrest warrant was eventually issued.

On the basis of this record, we cannot conclude that the trial judge abused his discretion in finding that the prosecution had acted with due diligence and in good faith in its unsuccessful efforts to have Merilee Maulson appear at trial. She was "unavailable."

The conditions for the invocation of the exception to the hearsay rule in respect to former testimony were satisfied. The preliminary-hearing testimony of Maulson was properly admitted into evidence at trial.

Another hearsay declaration of Maulson was also admitted. The record shows that, when Maulson escaped from the house, she was met by Louise Vetterneck, who five minutes before heard Merilee Maulson "hollering" in the house, behind the locked door. Louise Vetterneck left to call the police. She testified, when she returned she saw that Merilee's face and torso were covered with blood. She testified that Merilee ran from the house and was overtaken by her 20 or 30 feet down the road. Upon getting into the Vetterneck car, Merilee said, "Jerry did this to me." Louise Vetterneck was permitted to recount this statement at trial over defense counsel's objection that it was hearsay. The Public Defender contends on this appeal that it was "rank hearsay" and not admissible.

We conclude that it was admissible under the recognized hearsay exception of "excited utterance." Sec. 908.03(2), Stats., provides that the availability of the declarant is immaterial in respect to an excited utterance:

"A statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition."

Although an excited utterance is hearsay, at least when used for the purpose of proving the truth of the matter asserted therein, it is admissible as an exception to the hearsay rule because, it is thought, there is a special trustworthiness that ought to be accorded to a declarant's statement because the circumstances of the utterance and the excitement under which it is made suspend the declarant's powers of reflection or fabrication. As McCormick, *Evidence* (2d ed., hornbook series), sec. 297, p. 704, points out, the circumstances under which the utterance is made give it such reliability that it may be admitted at trial even though the declarant is available. McCormick states that the exception:

". . . suggests that his testimony on the stand, given at a time when his powers of reflection and fabrication are operative, is less reliable than his out-of-court declaration." (At 704)

The Judicial Council's committee note referring to sec. 908.03 (1), Stats., present sense impression, and (2) excited utterance, states:

"The time element is more narrowly measured under sub. (1) than sub. (2) to assure a circumstance of trustworthiness. In the latter subdivision [excited utterance], time is also important but measured by the duration of the condition of excitement rather than mere time lapse from the event or condition described." 59 Wis.2d R256.

The State Public Defender argues that there is no evidence to show that the statement of Merilee Maulson was made while she was under the stress of the excitement; and, accordingly, he contends that the foundation necessary under the exception for the admission of the statement is missing from the record.

We have carefully examined the record, and it is true that the record fails to show that Merilee was "excited" when she made the statement. However, the record shows that Merilee immediately prior to the utterance

was running down the road and "She was all bloody."
She had been stabbed and slashed less than five minutes before.

■ Whether the statement under these circumstances was to be admitted into evidence was within the discretion of the trial court. *Cossette v. Lepp,* 38 Wis.2d 392, 398, 157 N.W.2d 629. This court will uphold that exercise of discretion unless the circumstances show that the ruling was manifestly wrong and an abuse of discretion. *Cornwell v. Rohrer,* 38 Wis.2d 252, 259, 156 N.W.2d 373 (1968). In *Cossette,* we pointed out that in the exercise of discretion a trial judge may properly admit statements which are:

". . . made at a time or under circumstances when the declarant is not likely to have reflected on the event he reports or to have conjured up some untrue version of that event." (At 398)

The evidence shows that the statement was made within a very few minutes after the knife attack upon Merilee Maulson. At the very most, the time elapsed could not have been more than five minutes. Moreover, the evidence is clear that Merilee Maulson escaped from the house at the first opportunity. She was running and was bleeding from the wounds. It is apparent, therefore, that the statement was made under circumstances when it was most unlikely that the declarant indulged in reflection on the event or had the opportunity to conjure up an untrue version of it. While it would have been preferable for the prosecutor specifically to ask Vetterneck whether Merilee Maulson appeared to be excited or agitated at the time she made the statement, the surrounding circumstances show that she was in fact excited and under the immediate influence of the attack.

■ We cannot conclude that the trial judge was manifestly wrong or that he abused his discretion in

admitting the statement into evidence. That his conclusion was consistent with past precedent is borne out by this court's opinion in *Phifer v. State,* 64 Wis.2d 24, 218 N.W.2d 354 (1974). In *Phifer,* the statement of a shooting victim to an ambulance attendant came ten or fifteen minutes after the shooting. This court stated:

"[T]he declarant had just been removed from his position on the pavement and was for the first time receiving some medical aid. The shock of the event was great enough to make it reasonable that at the time the declarant was still in an excited state." (At 36)

Merilee Maulson made the statement within five minutes after the stabbing and immediately after she had escaped from her assailant, it was not unreasonable for the trial judge to conclude that she was still in an excited state. Her declaration, recounted by Louise Vetterneck, was properly admissible under the "excited utterance" exception to the hearsay rule.

The injuries sustained by Merilee Maulson were of a nature that the jury could properly conclude beyond a reasonable doubt that they constituted "great bodily harm" as defined in secs. 940.23 and 939.22(14), Stats.

The trial judge properly exercised his discretion in concluding that Merilee Maulson's preliminary-hearing testimony was admissible at trial because the state proved that she was "unavailable" and used due diligence to secure her presence.

The hearsay statement of Merilee Maulson recounted by the testimony of Louise Vetterneck was properly admitted as an excited utterance.

*By the Court.*—Judgment and order affirmed.