STATE of Wisconsin, Plaintiff-Respondent,

v.

Mahlick D. ELLINGTON, Defendant-Appellant.†

Court of Appeals

*No. 2004AP2325–CR. Submitted on briefs October 4, 2005.*
*—Decided October 25, 2005.*

2005 WI App 243

(Also reported in 707 N.W.2d 907.)

† Petition to review denied 1-24-06.

264

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Andrea Taylor Cornwall*, assistant state public defender, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Peggy A. Lautenschlager*, attorney general, and *James M. Freimuth*, assistant attorney general.

Before Wedemeyer, P.J., Fine and Curley, JJ.

¶ 1. FINE, J.   Mahlik D. Ellington appeals from an original and an amended judgment entered on a jury verdict convicting him of causing great bodily harm to Marilyn B. with intent to cause great bodily harm to her, *see* Wis. Stat. § 940.19(5) (1999–2000), and from an

order denying his motion for postconviction relief.[1] He contends that: (1) the trial court erred in instructing the jury on "great bodily harm"; (2) he was denied his right to confrontation; and (3) his trial lawyer gave him constitutionally deficient representation. We affirm, but remand to the trial court with directions to issue a second amended judgment of conviction that spells correctly Ellington's first name: "Mahlik," not "Mahlick," as it is spelled in both the original and the amended judgment.

## I.

¶ 2. Ellington admits to beating Marilyn B. His defense was that her injuries did not constitute "great bodily harm." " 'Great bodily' harm means bodily injury which creates a substantial risk of death, or which causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ or other serious bodily injury." Wis. Stat. § 939.22(14).

¶ 3. Marilyn B. testified that she had dated Ellington for one month, and that when she told him that she wanted to end their relationship, he choked her, hit

---

[1] Mahlik D. Ellington was convicted for what he did to Marilyn B. on January 27, 2003. Wisconsin Stat. § 940.19(5) was amended, effective February 1, 2003, to modify the provision as follows (additions underlined, deletions crossed out): "Whoever causes great bodily harm to another by an act done with intent to cause ~~either substantial bodily harm or~~ great bodily harm to that person or another is guilty of a Class ~~C~~ E felony." 2001 Wis. Act 109, §§ 608, 9459(1).

The initial judgment, dated September 26, 2003, added an habitual-criminality enhancer. *See* Wis. Stat. § 939.62. An amended judgment, dated, August 23, 2004, deleted the habitual-criminality enhancer.

her, and kicked her. The following are excerpts from her direct testimony describing what she claimed Ellington did to her:

- "He grabbed me around my neck and he choked me. He cut my wind off."

- He pushed her out the front door, and "still had [her] around [her] neck."

- Outside of the front door was a porch with a railing. "I flipped over that porch, or he pushed me over that porch, or something, and I end up on the ground, and he started beating me in my face and stomping on my face with his foot and my stomach and back and stuff. He was kicking me on my side."

- "I faded in and out."

- When asked how many times Ellington "stomped" on her face, Marilyn B. replied: "It was just once on my face. The rest was on my body."

- Ellington was "wearing tennis shoes" when he kicked her.

Later, on cross-examination, Marilyn B. further explained:

- "He had me by my windpipe. He knocked my air off of me and pushed me out the door."

- "He grabbed me around my neck. I thought he was grabbing me to say goodbye, see you later, with his arm; but instead, he put his hand around my neck, the prints was [sic] there, he grabbed me by my throat, put his thumb in my

269

throat, and knocked my wind pipe off. As I was telling him let me go, saying let me go. He let me go out the front door, with my back going out. And from there, I was over the rail of my fence, of my porch, fence, and I was saying, would you please let me go. He wouldn't let go . . . . I flipped over the porch, he went over the porch with me, and he just started hitting me in my face. And from there he started kicking me, and then he started stepping in my face."

- When Ellington's lawyer asked if Marilyn B. had "any broken bones," Marilyn B. replied: "My gums are still messed up."

Medical records received into evidence without objection, *see* WIS. STAT. RULE 908.03(6m) (health-care-provider-records exception to the rule against hearsay), and excerpts from those records were read to the jury by Erik Villarreal, a Milwaukee police detective. They indicated that Marilyn B. had "a blowout fracture," a "depressed frontal skull fracture," and a "right mandible fracture."[2]

¶ 4. Villarreal was the only person other than Marilyn B. to testify at the trial. He told the jury that he went to the hospital to talk to Marilyn B. shortly after she arrived there. He described what he saw:

[H]er eyes were all swollen shut, she was—seemed pretty brutally beaten. Her front lip was splitted [*sic*] wide open, and there was [*sic*] distinct tread patterns on her face from footprints, that we found pretty unique, so we called in our photographer later to get pictures of that before—if they were going to go away and the swelling reduced so they disappeared, so we got pictures right away. I believe there was bleeding in the

---

[2] The medical records themselves are not part of the record on appeal.

ear as well, visible bleeding from the ear, nose, mouth, eyes. She was really beaten pretty bad.

Villarreal also told the jury that when they arrested Ellington, he was wearing shoes whose treads were "consistent" with the tread marks on Marilyn B.'s face. The jury saw photographs that confirmed the severity of Marilyn B.'s injuries.

## II.

¶ 5. As noted, Ellington contends that the trial court erred in instructing the jury on "great bodily harm." He also argues that the trial court deprived him of his constitutional right to confrontation by permitting the police detective to read from the medical reports, and, also, to tell the jury that in the past the detective found certified medical records to be reliable. Recognizing that his trial lawyer did not object to receipt of the medical records into evidence, Ellington also argues that his lawyer gave him constitutionally deficient representation. We analyze these contentions in turn.

A.  *Great Bodily Harm.*

■

¶ 6.  As we have seen in footnote one, the statute applicable to the charge that Ellington inflicted "great bodily harm" on Marilyn B. read:  "Whoever causes great bodily harm to another by an act done with intent to cause either substantial bodily harm or great bodily harm to that person or another is guilty of a Class C felony." Wis. Stat. § 940.19(5) (1999–2000). As we have also seen, " '[g]reat bodily harm' " meant (and means today) "bodily injury which creates a substantial risk of death, or which causes serious permanent disfigure-

ment, or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ or other serious bodily injury." Wis. Stat. § 939.22(14). The trial court instructed the jury that it could find Ellington guilty of "great bodily harm" if it found that the State had proven beyond a reasonable doubt that he inflicted "serious bodily injury" on her: "Great bodily harm means serious bodily injury. You, the jury, are to alone to determine whether the bodily injury in your judgment is serious." Ellington argues that this was error because without telling the jury the context of the phrase "other serious bodily injury," the jury was free, he contends, to find him guilty for acts that did not meet the great-bodily-harm threshold; in essence, he seeks to have the phrase "other serious bodily injury" limited by the preceding list, using a tool of statutory construction known as *ejusdem generis. See State v. Peters*, 2003 WI 88, ¶ 10, 263 Wis. 2d 475, 480–481, 665 N.W.2d 171, 174. He thus claims that the instruction deprived him of due process. We disagree.

¶ 7

A trial court has broad discretion in instructing a jury but must exercise that discretion in order to fully and fairly inform the jury of the applicable rules of law. Whether a jury instruction is appropriate, under the given facts of a case, is a legal issue subject to independent review. On review, the challenged words of jury instructions are not evaluated in isolation. Rather, jury instructions "must be viewed in the context of the overall charge." Relief is not warranted unless the court is "persuaded that the instructions, when viewed as a whole, misstated the law or misdirected the jury." Whether a jury instruction violated a defendant's right to due process is a legal issue subject to *de novo* review.

*State v. Ziebart*, 2003 WI App 258, ¶ 16, 268 Wis. 2d 468, 480–481, 673 N.W.2d 369, 375 (citations and quoted source omitted). The flaw in Ellington's argument is his contention that the legislature intended the phrase "other serious bodily injury" to assume the coloration of the list of specific injuries that precede it. But that was *not* the legislature's intent. *La Barge v. State*, 74 Wis. 2d 327, 333, 246 N.W.2d 794, 797 (1976). Thus, the doctrine of *ejusdem generis* is not applicable and does not narrow the otherwise broad scope of "other serious bodily injury." *Id.*, 74 Wis. 2d at 332–333, 246 N.W.2d at 796–797. Indeed, *La Barge* concluded unambiguously: "Our study of the legislative history of the particular statute leads, however, to the conclusion that the phrase, 'or other serious bodily injury,' was designed as an intentional broadening of the scope of the statute to include bodily injuries which were serious, although not of the *same type or category* as those recited in the statute." *Id.*, 74 Wis. 2d at 332, 246 N.W.2d at 796 (emphasis added).

¶ 8.   *La Barge's* holding that *ejusdem generis* does not apply to what is "great bodily harm" under Wis. Stat. § 940.19(5) was reaffirmed by *Cheatham v. State*, 85 Wis. 2d 112, 119–124, 270 N.W.2d 194, 198–200 (1978), upon which Ellington relies for the opposite proposition. Although *Cheatham* held that it would not be improper to read to a jury the full statutory definition of "great bodily harm" in situations where the trial court determined in the exercise of its discretion that it might be helpful to the jury, it reaffirmed that giving meaning to the phrase "serious bodily injury" was well within a jury's ability. *Id.*, 85 Wis. 2d at 123–124, 270 N.W.2d at 200. Indeed, *Cheatham* answered the following question in the affirmative:   "[W]hether the phrase

273

'or other serious bodily injury,' without being restricted by the rule of *ejusdem generis* to the enumerated types of injury, sufficiently identifies the degree of injury necessary for a jury to convict a defendant of a violation of [§ 940.19(5)'s predecessor]," concluding that the phrase "serious bodily injury" is of " 'ordinary significance' " so that a " 'trial court need not define [it] in its instructions' " because the words " 'are well understood by any jury of ordinary intelligence.' " *Id.*, 85 Wis. 2d at 122–123, 270 N.W.2d at 199–200 (quoted source omitted). Indeed, *Cheatham* made this clear in the part of its decision upon which Ellington most relies:

> Presented with an instruction containing the entire statutory definition of "great bodily harm" a jury could reasonably interpret the phrase "other serious bodily injury" in that context, particularly so because of the preceding phrases which describe severe injuries. *Even though the general phrase is not restricted to the meaning of the enumerated injuries, it acquires sufficient definition because of the nature of the injuries enumerated.*
>
> > "General and specific words in a statute which are associated together and which are capable of an analogous meaning, take color from each other, so that the general words are restricted to a sense analogous to the less general . . . ."

*Id.*, 85 Wis. 2d at 124, 270 N.W.2d at 200 (emphasis added). *Cheatham* quoted what the decision cited as "73 Am. Jur.2d, *Statutes*, p. 407, sec. 214." *Cheatham*, 85 Wis. 2d at 124, 270 N.W.2d at 200. The quoted material is now found at 73 Am. Jur. 2d *Statutes* § 135 (2001), and, references the very doctrine that *Cheatham* recognized did not apply to the statutory definition of "great bodily harm":

274

> General and specific words in a statute which are associated together and which are capable of an analogous meaning take color from each other, so that the general words are restricted to a sense analogous to the less general. Similarly, in accordance with what is commonly known as the rule of *ejusdem generis,* where in a statute general words follow a designation of particular subjects or classes of persons, the meaning of the general words will ordinarily be presumed to be, and construed as, restricted by the particular designation, and as including only things or persons of the same kind, class, character, or nature as those specifically enumerated. In accordance with the rule of *ejusdem generis,* such terms as "other," "other thing," "other persons," "others," "otherwise," or "any other," when preceded by a specific enumeration, are commonly given a restricted meaning, and limited to articles of the same nature as those previously described.

73 AM. JUR. 2D *Statutes* § 135 (footnotes omitted). Despite the confusing reference to the second edition of American Jurisprudence's explanation of *ejusdem generis, Cheatham's* refusal to restrict the meaning of "other serious bodily injury" to the injuries "enumerated" in the statutory definition of "great bodily harm" must control. Indeed, this is reflected in the jury-instruction committee notes to the applicable pattern jury instruction, which recommend "that defining great bodily harm as 'serious bodily injury' is sufficient in most cases." WIS JI-CRIMINAL 1225, cmt. 2. Although not binding on us, the committee's assessment of a proper jury instruction is "persuasive." *State v. Olson,* 175 Wis. 2d 628, 642 n.10, 498 N.W.2d 661, 667 n.10 (1993).

¶ 9.    The trial court also did not err in telling the jury that it "alone" had to determine whether Ellington inflicted great bodily harm on Marilyn B. because that, too, is the law. *Flores v. State,* 76 Wis. 2d 50, 57–60, 250

N.W.2d 720, 724–725 (1977), *overruled on other grounds by State v. Richards*, 123 Wis. 2d 1, 10–11, 365 N.W.2d 7, 11 (1985). But *Flores* is also instructive here in connection with Ellington's argument that the trial court erred in not reading the full statutory definition of "great bodily harm" to the jury.

¶ 10. *Flores* determined that battery was a lesser-included offense of aggravated battery, *id.*, 76 Wis. 2d at 54, 250 N.W.2d at 722, and that the trial court in that case had erred in not instructing the jury on battery, *id.*, 76 Wis. 2d at 56–61, 250 N.W.2d at 723–725. *Richards* overruled *Flores* on this point. *Richards*, 123 Wis. 2d at 10–11, 365 N.W.2d at 11. But the legislature trumped *Richards* by decreeing that "[a]n included crime may be . . . [a] crime which is a less serious or equally serious type of battery than the one charged." Wis. Stat. § 939.66(2m). This was the law applicable to Ellington, *see* § 939.66(2m) (1999–2000), and it is the law now, *see* § 939.66(2m) (2003–04). Ellington was thus perfectly free to seek to have the jury determine whether he was guilty of aggravated battery, as charged, or some "less serious . . . type of battery," and no one could gainsay that if a less-serious type of battery were submitted to the jury it would have the sole responsibility "to determine whether the bodily injury in your judgment is serious," and, if so, return a guilty verdict on the aggravated-battery charge. *See Flores*, 76 Wis. 2d at 57–60, 250 N.W.2d at 724–725. But Ellington specifically and deliberately chose *not* to seek submission to the jury of a less-serious type of battery, and he cannot now complain that the trial court permitted the jury to decide whether Marilyn B.'s injuries were "serious" without overlaying the specific aggravated-battery examples also in Wis. Stat. § 939.22(14). Although Ellington would prefer otherwise, the doctrine of *ejusdem*

*generis* does not apply to § 939.22(14), *La Barge*, 74 Wis. 2d at 332–333, 246 N.W.2d at 796–797, and, as we have seen, *Cheatham* left *La Barge* intact.

### B. *Confrontation.*

[8]

¶ 11. Every defendant in a criminal case is entitled to confront his or her accusers: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. This clause applies to the states as well as to the federal government. *Pointer v. Texas*, 380 U.S. 400, 406 (1965). The Wisconsin Constitution also guarantees the right to confrontation: "In all criminal prosecutions the accused shall enjoy the right . . . to meet the witnesses face to face." WIS. CONST. art. 1, § 7. The two clauses are, "generally," coterminous. *State v. Hale*, 2005 WI 7, ¶ 43, 277 Wis. 2d 593, 607, 691 N.W.2d 637, 644. While the Sixth Amendment has "a preference for face-to-face confrontation at trial," *Ohio v. Roberts*, 448 U.S. 56, 63 (1980), *overruled on other grounds by Crawford v. Washington*, 541 U.S. 36, 60–69 (2004), face-to-face confrontation is not "an indispensable element of the Sixth Amendment's guarantee," *Maryland v. Craig*, 497 U.S. 836, 849 (1990) (child sexual-abuse victim may testify by one-way closed-circuit television out of defendant's physical presence).

¶ 12. As noted, Ellington complains that he was denied his right to confront the witnesses against him because the trial court permitted the detective to read to the jury excerpts of medical records that were already in evidence. He also argues that he was deprived of his right to confrontation because the trial

277

court overruled a "relevancy" objection to the detective being asked whether in the past he had generally found properly certified medical records to be reliable. These matters are not preserved for direct appellate review.

¶ 13. First, as we have seen, the certified medical records were received by the trial court without objection. Certainly, the jurors could have read the pertinent excerpts, and, also, the prosecutor or defense counsel could have read to the jury excerpts from those records. Ellington does not explain why *any* witness could not also read pertinent excerpts to the jury. Generally, the lawyer is the best reader in the courtroom, but there is no rule or doctrine that prevents the lawyer from asking a witness to read to the jury material that is in evidence.

¶ 14. Second, an objection on relevancy grounds does not preserve a confrontation-based argument. *See State v. Nelson*, 138 Wis. 2d 418, 439, 406 N.W.2d 385, 393–394 (1987) ("hearsay" objection does not preserve a confrontation issue), *habeas corpus granted sub nom. Nelson v. Ferrey*, 688 F. Supp. 1304 (E.D. Wis. 1988), *rev'd*, 874 F.2d 1222 (7th Cir. 1989); *State v. Gove*, 148 Wis. 2d 936, 941, 437 N.W.2d 218, 220 (1989) ("[E]ven the claim of a constitutional right will be deemed waived unless timely raised in the trial court."). Thus, Ellington's confrontation arguments must be analyzed in an ineffective-assistance-of-counsel context. *See Kimmelman v. Morrison*, 477 U.S. 365, 374–375 (1986); *State v. Carprue*, 2004 WI 111, ¶ 47, 274 Wis. 2d 656, 678, 683 N.W.2d 31, 41–42.

C. *Ineffective Assistance of Counsel.*

¶ 15. To establish ineffective assistance of counsel, a defendant must show: (1) deficient performance,

and (2) prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prove deficient performance, a defendant must point to specific acts or omissions by the lawyer that are "outside the wide range of professionally competent assistance." *Id.*, 466 U.S. at 690. To prove prejudice, a defendant must demonstrate that the lawyer's errors were so serious that the defendant was deprived of a fair trial and a reliable outcome. *Id.*, 466 U.S. at 687. Thus, in order to succeed on the prejudice aspect of the *Strickland* analysis, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*, 466 U.S. at 694. We turn to the two aspects of Ellington's confrontation arguments.

1.

¶ 16.   Ellington concedes that the excerpts from the medical records read to the jury were not testimonial under *Crawford*, 541 U.S. at 53–54 ("testimonial" hearsay is not admissible in a criminal trial against a defendant unless:   (1) "the defendant had had a prior opportunity for cross-examination," and (2) the hearsay declarant is "unavailable to testify"). Rather, he contends that the reading violated the rule in *State v. Rundle*, 166 Wis. 2d 715, 728, 480 N.W.2d 518, 524 (Ct. App. 1992), which ruled that admission of subjective, diagnostic opinions—as opposed to "clinical and nondiagnostic" "objective findings"—violated a defendant's rights of confrontation. Here, the detective read to the jury only the objective findings of the medical personnel as well as what Marilyn B. told them about her injuries, namely, among other things, that they were the result

279

of Ellington beating her. These latter nested statements by Marilyn B. in the medical records are also nondiagnostic under *Rundle*. *See id.*, 166 Wis. 2d at 729, 480 N.W.2d at 524. This clinical evidence is a far cry from the subjective conclusion in *Rundle* that Rundle's baby was the victim of child abuse. *Id.*, 166 Wis. 2d at 729–730, 480 N.W.2d at 524–525. We do not have to further discuss this aspect of Ellington's argument because he has not shown the requisite prejudice. *See Strickland*, 466 U.S. at 687. First, he has not shown that any of the clinical findings read to the jury by the detective were flawed. *See State v. Arredondo*, 2004 WI App 7, ¶ 40, 269 Wis. 2d 369, 397, 674 N.W.2d 647, 660 (defendant claiming ineffective assistance of counsel must establish how he or she was prejudiced by what the lawyer either did or did not do). Second, with respect to Marilyn B.'s statements to the medical personnel, Ellington has not disputed that he hit her. Accordingly, Ellington's ineffective-assistance-of-counsel contention with respect to the reading to the jury of the excerpts from Marilyn B.'s medical records fails. *See Strickland*, 466 U.S. at 697 (an ineffective-assistance-of-counsel claim fails unless the defendant establishes both deficient performance and prejudice).

2.

■

¶ 17. As we have seen, Ellington's "relevancy" objection at trial to the detective's experience with certified medical records did not preserve for appellate review any confrontation issue, if there is one (which we do not decide). Ellington does not argue on appeal that the detective's opinion was not relevant. *See* WIS. STAT. RULE 904.01 (" 'Relevant evidence' means evidence having any tendency to make the existence of any fact

that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."). Insofar as his "confrontation" objection is concerned, he does not show how the detective's opinion prejudiced him under the *Strickland* analysis: that is, he has not shown that the medical record excerpts read to the jury were flawed so that the detective's comment that in his experience certified medical records were reliable deprived Ellington of a fair trial. *See id.*, 466 U.S. at 687. Accordingly, this aspect of his ineffective-assistance-of-counsel contention fails as well.

*By the Court.*—Judgments and order affirmed and cause remanded with directions.