STATE of Wisconsin, Plaintiff-Respondent,

v.

Anthony Darnell DAVIS, Defendant-Appellant.†

Court of Appeals

*No. 2015AP2030–CR. Submitted on briefs May 31, 2016.*
*—Decided August 30, 2016.*

2016 WI App 73

† Petition for Review filed.

737

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Dustin C. Haskell*, assistant state public defender of Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Brad D. Schimel*, attorney general and *Jeffrey J. Kassel*, assistant attorney general.

Before Curley, P.J., Kessler and Brash, JJ.

¶ 1. KESSLER, J. On May 26, 2013, Anthony Darnell Davis was charged with two counts of physical abuse of a child by recklessly causing great bodily harm.[1] According to the criminal complaint, on May 14, 2013, L.D.'s mother, Lakiesha Bowie, took L.D. to Children's Hospital of Wisconsin because L.D. had blood in the whites of her eyes and redness around her eyes. It was the sixth time Bowie had taken L.D. to the hospital in the past month. Following an examination

---

[1] On May 26, 2013, the State filed an Amended Information charging Davis with two counts of physical abuse of a child by recklessly causing great bodily harm after it was discovered that L.D. sustained multiple rib fractures. The State initially charged Davis with one count of physical abuse of a child by recklessly causing great bodily harm on May 18, 2013. That charge followed the discovery of L.D.'s leg fractures.

by Dr. Angela Rabbitt, a pediatric child abuse specialist, it was determined that L.D. sustained the following injuries:

- Fractures to her left distal tibia and fibula
- Fractures to both femurs
- Fractures to six ribs
- A possible buckle fracture to the left proximal first metatarsal
- Subconjunctival hemorrhages
- Bruising to the eyes bilaterally
- Healing from a torn upper frenulum[2]

According to the Amended Information, Dr. Rabbitt told Milwaukee police that the fractures to L.D.'s legs, ribs, and eyes were consistent with child abuse. Davis was subsequently charged with two counts of physical abuse of a child causing great bodily harm pursuant to WIS. STAT. § 948.03 (2013–14).[3] The "repeater" penalty enhancer was added to both charges. Count one pertained to L.D.'s leg fractures and count two pertained to L.D.'s rib fractures.

¶ 2. Prior to trial, the parties stipulated that Bowie, as a witness for the State, would admit to eight prior convictions. The parties also stipulated that should Davis testify in his own defense, he would admit to five prior convictions.

**The Trial**

¶ 3. Multiple witnesses testified at trial. Milwaukee Police Officer Amy Stolowski, an officer with the

---

[2] The "frenulum" is the tissue connecting the upper lip to the gums.

[3] All references to the Wisconsin Statutes are to the 2013–14 version unless otherwise noted.

Sensitive Crimes Division, testified that she was dispatched to Children's Hospital of Wisconsin at approximately 2:45 a.m. on the morning of May 15, 2013, to investigate a potential child abuse matter. Stolowski said that L.D. was brought into the hospital with swelling and bruising to her face and that medical staff subsequently discovered multiple fractures. Stolowski said that she interviewed Davis, who told her that he and Bowie were L.D.'s sole caregivers. Stolowski said Davis had no explanation for L.D.'s injuries.

¶ 4. Milwaukee Police Detective Marilyn Francis testified that she interviewed Davis after he was taken into custody on suspicion of child abuse. Francis said that Davis initially denied having any knowledge as to the source of L.D.'s injuries and said that L.D. always remained with her mother. Portions of Francis's interview with Davis were played for the jury. In the interview, Davis told Francis that L.D. fell off of a bed and off of a rocker. Davis also told Francis that he was walking with L.D. the day before her hospital visit and heard a "popping" sound. Francis stated that during the interview, she asked Davis to demonstrate how Davis changed L.D.'s diaper on a baby doll. Francis described Davis's movements as "overly exaggerated," as he spread the dolls legs "extremely wide" and "would fold the baby's legs over . . . to the baby's chest." Davis told Francis that Bowie complained about him being too rough with L.D.

¶ 5. Bowie testified that in the month preceding L.D.'s injuries, Bowie took L.D. to the hospital five times for various concerns, including fussiness and blood in L.D.'s eyes. She stated that she and Davis were L.D.'s sole caretakers. Bowie stated that when she was informed of L.D.'s injuries, she was confused as to the cause and told doctors that she had rolled

over L.D. while co-sleeping. Bowie said that Davis was with her at the hospital and did not mention that he could have caused L.D.'s injuries. Bowie also identified Davis's voice in a number of phone calls from the jail in which Davis admitted to using drugs and sitting on L.D. Bowie stated she was unaware that Davis used drugs.

¶ 6. Dr. Rabbitt, the child abuse pediatrician who examined L.D. at Children's Hospital, told the jury that rolling onto a child on a bed would not have caused L.D.'s injuries. Dr. Rabbitt testified that when she first saw L.D., she noticed bruising around both of L.D.'s eyes and her cheek and that L.D. had a laceration to the tissue connecting the inside of L.D.'s lip to her gums. Dr. Rabbitt testified that all of these injuries are rare in "nonmobile" infants and generally prompt doctors to conduct further testing. Dr. Rabbitt also noticed conjunctival hemorrhages. Dr. Rabbitt stated that the hemorrhages, in conjunction with the bruising, can be indicative of blunt force trauma in an infant. Dr. Rabbitt said that x-rays confirmed that L.D. had multiple broken ribs and fractures in her legs. The leg fractures included: metaphyseal fractures in both knees, a fracture in the distal femur, metaphyseal fractures in the left ankle, the tibia, and the fibula, and a fracture in the foot. Dr. Rabbitt testified that fractures in nonmobile infants are also rare and are often associated with abuse. She stated that the injuries L.D. suffered are consistent with "the mechanism of pulling and twisting of the leg or in some cases if a child is shaken and the arms and legs are moving violently, those forces can cause this type of fracture to the joints."

¶ 7. Davis also testified, telling the jury that he never squeezed, shook, or pulled L.D. He admitted,

however, to sitting on L.D. either one or two days prior to L.D.'s May 14, 2013 hospital visit. Davis testified that he used cocaine outside of the motel room he lived in with Bowie and L.D. and that he accidentally sat on L.D. when he returned to the room. Davis stated that he got up right away and did not sit on L.D. for more than "a couple seconds." Davis stated that Bowie and his twelve-year old son were sleeping at the time, but that Bowie woke up when she heard L.D. cry. Davis gave L.D. to Bowie without telling Bowie that he sat on L.D. Davis testified that he weighed 315 pounds at the time. Davis also admitted to telling police that Bowie is a wonderful mother.

¶ 8. Ultimately, the jury convicted Davis of both child abuse charges.

## The Postconviction Motion

¶ 9. Davis filed a postconviction motion arguing that his counsel was ineffective for failing to impeach Bowie with her prior convictions. Davis argued that because Bowie was an equal caregiver for L.D., admitted to co-sleeping with L.D., and to rolling onto L.D. while sleeping, Bowie's prior convictions were relevant to her credibility.

¶ 10. The postconviction court denied the motion, finding "that there is no reasonable probability that there would have been a different outcome had trial counsel impeached Ms. Bowie with her prior convictions." The court determined that "[t]here was no suggestion in the evidence that Ms. Bowie had done anything to L.D. that could have resulted in the injuries [L.D.] sustained."

¶ 11. This appeal follows.

746

## DISCUSSION

¶ 12. On appeal, Davis urges us to reverse his conviction because "broken bones are insufficient as a matter of law to constitute great bodily harm." (Some capitalization omitted.) He also argues that his trial counsel was ineffective for failing to impeach Bowie with her prior convictions. We address both issues.

### Great Bodily Harm

¶ 13. Davis contends that "[b]roken bones are explicitly enumerated as one of the injuries constituting *substantial* bodily harm; therefore, they cannot simultaneously constitute the more severe *great* bodily harm." Specifically, Davis contends that because the statutory definition of "substantial bodily harm" as set forth in Wis. Stat. § 939.22(38) specifically references "any fracture of a bone," Davis was held to a higher standard of harm when he was convicted of causing great bodily harm to L.D. for the fractures she suffered. We reject Davis's arguments for multiple reasons.

¶ 14. The interpretation of a statute is a question of law that we review *de novo*. *See State v. Volk*, 2002 WI App 274, ¶ 34, 258 Wis. 2d 584, 654 N.W.2d 24. Statutory interpretation begins with the language of the statute. *State ex rel. Kalal v. Circuit Court for Dane Cty.*, 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110. "Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning." *Id.* We

747

interpret statutory language in the context in which it is used, in relation to the language of surrounding or closely-related statutes, and reasonably, to avoid absurd or unreasonable results. *Id.*, ¶ 46. We may consider the statute's purpose, to the extent it is readily apparent from the statutory text or from the statute's context or structure. *See id.*, ¶ 49. " 'If this process of analysis yields a plain, clear statutory meaning, then there is no ambiguity, and the statute is applied according to this ascertainment of its meaning.' " *Id.*, ¶ 46 (citation omitted). If, however, we determine the statute is ambiguous, we consult extrinsic sources, such as legislative history, to determine the legislature's intent. *See id.*, ¶ 50.

¶ 15. The general criminal definitions include definitions for three types of bodily harm. The types are, in order of increasing severity, bodily harm, substantial bodily harm, and great bodily harm. *See* Wis. Stat. § 939.22(4), (14), and (38). The definition of "great bodily harm" is: "bodily injury which creates a substantial risk of death, or which causes serious permanent disfigurement, or which causes a permanent or protracted loss or impairment of the function of any bodily member or organ or other serious bodily injury." Sec. 939.22(14). The definition of "substantial bodily harm" is: "bodily injury that causes a laceration that requires stitches, staples, or a tissue adhesive; any fracture of a bone; a broken nose; a burn; a petechia; a temporary loss of consciousness, sight or hearing; a concussion; or a loss or fracture of a tooth." Sec. 939.22(38).

¶ 16. We note first that the definition of "substantial bodily harm" that Davis relies upon is inapplicable to Wis. Stat. § 948.03, the child abuse statute. Davis was charged pursuant to § 948.03, which penal-

748

izes two types of harm: (1) bodily harm and (2) great bodily harm. *See id.* The statute does not reference substantial bodily harm.[4] There is no offense of physi-

---

[4] WISCONSIN STAT. § 948.03 provides:

(1) DEFINITIONS. In this section, "recklessly" means conduct which creates a situation of unreasonable risk of harm to and demonstrates a conscious disregard for the safety of the child.

(2) INTENTIONAL CAUSATION OF BODILY HARM. (a) Whoever intentionally causes great bodily harm to a child is guilty of a Class C felony.

(b) Whoever intentionally causes bodily harm to a child is guilty of a Class H felony.

(c) Whoever intentionally causes bodily harm to a child by conduct which creates a high probability of great bodily harm is guilty of a Class F felony.

(3) RECKLESS CAUSATION OF BODILY HARM. (a) Whoever recklessly causes great bodily harm to a child is guilty of a Class E felony.

(b) Whoever recklessly causes bodily harm to a child is guilty of a Class I felony.

(c) Whoever recklessly causes bodily harm to a child by conduct which creates a high probability of great bodily harm is guilty of a Class H felony.

(4) FAILING TO ACT TO PREVENT BODILY HARM. (a) A person responsible for the child's welfare is guilty of a Class F felony if that person has knowledge that another person intends to cause, is causing or has intentionally or recklessly caused great bodily harm to the child and is physically and emotionally capable of taking action which will prevent the bodily harm from occurring or being repeated, fails to take that action and the failure to act exposes the child to an unreasonable risk of great bodily harm by the other person or facilitates the great bodily harm to the child that is caused by the other person.

(b) A person responsible for the child's welfare is guilty of a Class H felony if that person has knowledge that another person intends to cause, is causing or has intentionally or recklessly caused bodily harm to the child and is physically and emotionally capable of taking action which will prevent the bodily harm from occurring or being repeated, fails to take that action and the failure to act exposes the child to an unreasonable risk of bodily

749

cal abuse of a child by causing substantial bodily harm. Rather, the definition of "substantial bodily harm" that Davis relies upon was created in 1994 as a part of

harm by the other person or facilitates the bodily harm to the child that is caused by the other person.

**(5)** ENGAGING IN REPEATED ACTS OF PHYSICAL ABUSE OF THE SAME CHILD. (a) Whoever commits 3 or more violations under sub. (2), (3), or (4) within a specified period involving the same child is guilty of the following:

1. A Class A felony if at least one violation caused the death of the child.

2. A Class B felony if at least 2 violations were violations of sub. (2)(a).

3. A Class C felony if at least one violation resulted in great bodily harm to the child.

4. A Class D felony if at least one violation created a high probability of great bodily harm to the child.

5. A Class E felony.

(b) If an action under par. (a) is tried to a jury, in order to find the defendant guilty the members of the jury must unanimously agree that at least 3 violations of sub. (2), (3), or (4) occurred within the specified period but need not agree on which acts constitute the requisite number.

(c) The state may not charge in the same action a defendant with a violation of this subsection and with a violation involving the same child under sub. (2), (3), or (4), unless the other violation occurred outside of the period applicable under par. (a). This paragraph does not prohibit a conviction for an included crime under s. 939.66 when the defendant is charged with a violation of this subsection.

**(6)** TREATMENT THROUGH PRAYER. A person is not guilty of an offense under this section solely because he or she provides a child with treatment by spiritual means through prayer alone for healing in accordance with the religious method of healing permitted under s. 48.981(3)(c)4 or 448.03(6) in lieu of medical or surgical treatment.

WISCONSIN STAT. § 948.03(5) was created pursuant to 2015 Wis. Act 366, § 18.

750

the legislature's re-creation of the general battery statute. *See* 1993 Wis. Act 441, §§ 1, 4. Prior to 1994, both the child abuse statute and WIS. STAT. § 940.19, the general battery statute, recognized two types of harm: (1) bodily harm and (2) great bodily harm. In 1994, the legislature repealed and recreated § 940.19 to create three types of battery: (1) battery causing bodily harm; (2) battery causing substantial bodily harm; and (3) battery causing great bodily harm. *See* 1993 Wis. Act. 441, §§ 1, 4. While the general battery statute was amended to include an intermediate level of harm, the child abuse statute remained the same. As relevant to this appeal, the child abuse statute has remained largely the same to this day. We must assume that the legislature's decision to add the "substantial bodily harm" language to § 940.19 and not to § 948.03 was intentional. *See State v. MacArthur*, 2008 WI 72, ¶ 30, 310 Wis. 2d 550, 750 N.W.2d 910 ("We must assume that the legislature has reviewed the legislation and that it intends the words used be given their meaning."). Accordingly, we conclude that the statutory definition of "substantial bodily harm" is irrelevant to the facts of this case.

¶ 17. However, because there are no published Wisconsin cases discussing whether injury constituting "great bodily harm" can simultaneously constitute "substantial bodily harm," we address the merits of Davis's arguments. Davis contends that L.D.'s bone fractures cannot constitute "great bodily harm" because bone fractures are specifically enumerated in the statutory definition of "substantial bodily harm." In essence, Davis argues that if a fracture does not meet one of the specific conditions in the definition of "great bodily harm" involving risk of death, disfigurement, a permanent or protracted loss or impairment of the

function of any bodily member or organ, or another serious bodily injury, then that fracture can never be classified as great bodily harm, but is limited to being only substantial bodily harm.

¶ 18. The State concedes that the bone fractures forming the basis of the charges do not involve a risk of death, disfigurement, or a permanent or protracted loss or impairment of any part of L.D.'s body. Rather, the State contends that L.D.'s injuries fall under the "other serious bodily injury" segment of the "great bodily harm" definition. *See* WIS. STAT. § 939.22(14). Davis contends that the State's argument disrupts the harmony between the three gradations of harm and renders the definition of "substantial bodily harm" superfluous. We reject Davis's argument for several reasons.

¶ 19. First, Davis's argument implies that the phrase "other serious bodily injury" must be read as including only injuries that "rise to the level of creating a substantial risk of death, causing serious or permanent disfigurement, or which cause a permanent or protracted loss or impairment of the function of any bodily member or organ." According to Davis, this is necessary so as to distinguish between those fractures that are substantial bodily harm merely by being fractures, and those that have some additional quality that makes them great bodily harm. This interpretation would leave the phrase "other serious bodily injury" with no meaning. Davis appears to be arguing that an injury is not serious unless it meets one of the other criteria for great bodily harm. However, if an injury meets one of those criteria, there is never a reason to consider whether it qualifies as an "other serious bodily injury," and *that phrase* would be reduced to surplusage. *See Lake City Corp. v. City of*

*Mequon*, 207 Wis. 2d 155, 162, 558 N.W.2d 100 (1997) (it is a basic rule of statutory construction that no part of a statute is to be rendered surplusage).

¶ 20. Indeed, we have addressed the question of whether the phrase "other serious bodily injury" was "limited by the preceding list, using a tool of statutory construction known as *ejusdem generis*" in *State v. Ellington*, 2005 WI App 243, ¶ 6, 288 Wis. 2d 264, 707 N.W.2d 907. In that case, Mahlik D. Ellington argued that the trial court erred in instructing the jury "that it could find Ellington guilty of 'great bodily harm' if it found that the State had proven beyond a reasonable doubt that he inflicted 'serious bodily injury' on [his girlfriend]: 'Great bodily harm means serious bodily injury. You, the jury, are to alone to determine whether the bodily injury in your judgment is serious.' " *Id.*, ¶ 6. Ellington argued that the phrase "serious bodily injury" gave the jury the liberty to find him guilty of acts that did not constitute "great bodily harm" because the trial court did not limit the jury's consideration to the list of injuries preceding the phrase. *Id.* We expressly rejected the contention that "the legislature intended the phrase 'other serious bodily injury' to assume the coloration of the list of specific injuries that precede it." *See id*, ¶ 7. Relying on previous case law and legislative history, we concluded that "[o]ur study of the legislative history of the particular statute leads, however, to the conclusion that the phrase, 'or other serious bodily injury,' was designed as an intentional broadening of the scope of the statute to include bodily injuries which were serious, although not of the same type or category as those recited in the statute." *Id.* (one set of quotation marks, citation, and emphasis omitted). When the legislature created the "substan-

tial bodily harm" standard, it did not amend the "great bodily harm" standard to remove the phrase "other serious bodily injury" from the definition of "great bodily harm." "[W]here a legislative act has been construed by [an appellate] court, the legislature is presumed to know that in the absence of the legislature explicitly changing the law, the court's construction will remain unchanged." *Blazekovic v. City of Milwaukee*, 225 Wis. 2d 837, 845, 593 N.W.2d 809 (Ct. App. 1999). Had the legislature intended to narrow the statutory definition of "great bodily harm," the legislature could easily have modified the phrase "other serious bodily injury" in Wis. Stat. § 939.22(14).

¶ 21. Accordingly, it is not out of the question to expect some overlap between the definitions of "great bodily harm" and "substantial bodily harm." Just because all fractures meet the definition of substantial bodily harm, that does not imply that a particular fracture, or multiple fractures as is the case here, cannot be serious enough to qualify as an "other serious bodily injury" for purposes of being great bodily harm. Likewise, burns are included in the definition of "substantial bodily harm," but some burns are severe enough as to cause "permanent disfigurement" or a loss of use of a particular body part in accordance with the definition of "great bodily harm." As the Wisconsin Supreme Court acknowledged in *Flores v. State*, 76 Wis. 2d 50, 58, 250 N.W.2d 720 (1977), *overruled on other grounds by State v. Richards*, 123 Wis. 2d 1, 10–11, 365 N.W.2d 7 (1985), "it is not easy as a matter of law to draw the line of demarcation between 'great bodily harm' . . . and

'bodily harm.' " "[I]n many cases the situation will fall into a twilight zone" that the jury must resolve. *Flores*, 76 Wis. 2d at 59.

¶ 22. Here, a reasonable jury could conclude that Davis caused L.D. "great bodily harm." L.D. suffered from not just one, but multiple, fractures. L.D. was an infant when she sustained multiple broken ribs, four broken leg bones, and a broken bone in her foot. She also sustained hemorrhages and bruising around her eyes. Multiple witnesses testified that the nature of L.D.'s injuries, particularly the manner in which her leg was manipulated, was consistent with abuse and that such injuries are rare in infants. Accordingly, we reject Davis's argument that L.D.'s broken bones do not constitute "great bodily harm."

## Ineffective Assistance of Counsel

¶ 23. Davis also contends that his counsel was ineffective for failing to impeach Bowie with her prior convictions. We disagree.

¶ 24. The two-pronged test for ineffective assistance of counsel claims requires a convicted defendant to prove both deficient performance by counsel and prejudice to the defense as a consequence. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To demonstrate deficient performance, the defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* To demonstrate prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability

sufficient to undermine confidence in the outcome." *Id.*
at 694. If a defendant fails to make a sufficient showing
on one *Strickland* prong, we need not address the
other. *Id.* at 697.

¶ 25. A claim that counsel was ineffective pres-
ents mixed questions of law and fact. *State v. Johnson,*
153 Wis. 2d 121, 127, 449 N.W.2d 845 (1990). We will
uphold a postconviction court's findings of historical
fact unless they are clearly erroneous. *See id.* Whether
the attorney's performance was deficient and whether
any deficiency prejudiced the defendant are questions
of law that we review *de novo. See id.* at 128.

¶ 26. Davis argues that a core defense theory
was "to show that Ms. Bowie was responsible for the
injuries, thereby creating a reasonable doubt as to Mr.
Davis' guilt." Davis contends that his defense was
prejudiced by counsel's failure to ask Bowie about her
prior convictions because "Bowie's credibility was not
further undermined with her lengthy criminal record."

¶ 27. The postconviction court thoroughly articu-
lated its rationale for rejecting Davis's argument when
it stated:

> [t]he defendant's story evolved substantially from his
> first interview to his testimony at trial. He initially
> reported to Officer Stolowski that he didn't know
> anything about the cause of L.D.'s injuries. He later
> told Detective Francis that she had fallen off a bed and
> a rocker the previous day and that he heard a popping
> noise while walking her. Eventually he stated on the
> telephone to a relative that he had sat on L.D.
>
> On the other hand, Ms. Bowie's statements re-
> mained substantially consistent. The defendant him-

self characterized her as a wonderful, loving, caring mother, which is borne out by her testimony that she took her three-month old child to the hospital five times in a one-month period and her efforts to make sure that only she and L.D.'s father took care of her. There was no suggestion in the evidence that Ms. Bowie had done anything to L.D. that could have resulted in the injuries she sustained. The extreme injuries the child sustained were inconsistent with an injury caused by Ms. Bowie rolling onto L.D. or by a fall. The doctor found that the injuries were consistent with child abuse and concluded that the child had been physically abused.

(Record citations and footnote omitted.)

¶ 28. We agree with the postconviction court's analysis. Even if trial counsel had impeached Bowie with the fact of her prior convictions, the jury still would have heard from the multiple witnesses who testified as to L.D.'s injuries, L.D.'s health history, Bowie's care for her child, and Davis's changing stories as to the possible causes of L.D.'s injuries. Counsel's failure to impeach Bowie does not undermine our confidence in the outcome. Evidence of Bowie's prior convictions would not have sufficiently undermined her credibility so as to alter the outcome of the trial. Accordingly, we conclude that Davis has not shown *Strickland* prejudice.

*By the Court.*—Judgment and order affirmed.