# COURT OF APPEALS OF WISCONSIN
# PUBLISHED OPINION

Case No.:          2020AP1981-CR

†Petition for Review filed

Complete Title of Case:

**STATE OF WISCONSIN,**

　　　　**PLAINTIFF-RESPONDENT,**

　　**V.**

**SERGIO MOISES OCHOA,**

　　**DEFENDANT-APPELLANT.†**

| | |
|---|---|
| Opinion Filed: | June 30, 2022 |
| Submitted on Briefs: | February 24, 2022 |
| Oral Argument: | |

| | |
|---|---|
| JUDGES: | Gundrum, P.J., Neubauer and Grogan, JJ. |
| Concurred: | |
| Dissented: | |

Appellant
ATTORNEYS:　　　On behalf of the defendant-appellant, the cause was submitted on the briefs of *Steven Roy,* Law Office of Steven Roy.

Respondent
ATTORNEYS:　　　On behalf of the plaintiff-respondent, the cause was submitted on the brief of *John A. Blimling*, assistant attorney general, and *Joshua L. Kaul*, attorney general.

**2022 WI App 35**

COURT OF APPEALS
DECISION
DATED AND FILED

June 30, 2022

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

**This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.**

**A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals.** *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2020AP1981-CR**

Cir. Ct. No. **2017CF478**

STATE OF WISCONSIN

**IN COURT OF APPEALS**

STATE OF WISCONSIN,

  PLAINTIFF-RESPONDENT,

 V.

SERGIO MOISES OCHOA,

  DEFENDANT-APPELLANT.

APPEAL from a judgment of the circuit court for Sheboygan County: REBECCA L. PERSICK, Judge. *Affirmed*.

Before Gundrum, P.J., Neubauer and Grogan, JJ.

¶1    GROGAN, J.   Sergio Moises Ochoa appeals from a judgment entered after a jury found him guilty of two counts of first-degree reckless homicide,

contrary to WIS. STAT. § 940.02(1) (2019-20).[1] Ochoa argues the trial court violated his constitutional right to present a defense when it: (1) excluded evidence about the victims' past violent acts; (2) excluded three of his proposed expert witnesses; and (3) limited his testimony about why he returned to the home of one of the victims in the middle of the night. He further contends the trial court erroneously exercised its discretion when it refused to modify WIS JI—CRIMINAL 1016 to include within it a portion of WIS JI—CRIMINAL 805. We affirm.

## I. BACKGROUND

¶2     In August 2017, the State charged Ochoa with two counts of first-degree intentional homicide arising out of an incident that occurred in the early morning hours of July 30, 2017. The victims were Luis Garcia, who was Ochoa's cousin, and a friend, Fernando Lopez. Ochoa pled not guilty and asserted at trial that he shot both men in self-defense when an argument arose about why Ochoa changed his mind about having Garcia act as the godfather for Ochoa's son's First Communion. As a part of his self-defense case, Ochoa argued that the combination of the alcohol and cocaine in Garcia's and Lopez's blood caused them to act erratically and threaten Ochoa, which caused Ochoa to believe he needed to shoot them to survive.[2]

---

[1] All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

[2] The toxicology reports run as part of the autopsies showed Garcia's blood alcohol concentration was .108 and showed he had both cocaine and THC in his system. Lopez's blood alcohol concentration was .16 and showed he had cocaine in his system.

¶3      Ochoa filed thirty-eight motions in limine.  As material here, in support of his self-defense theory, Ochoa filed a motion seeking to introduce evidence that "related to past acts of violence" of both victims, which is commonly referred to as *McMorris* evidence.[3]  The State objected to Ochoa's *McMorris* evidence, asserting that Ochoa had failed to provide sufficient information to establish its relevance and that even, if it was relevant, it should be excluded under WIS. STAT. § 904.03 because any probative value was outweighed by its unfairly prejudicial nature.  The trial court allowed Ochoa "to introduce reputation evidence" "regarding the decedents' reputation for violence" but excluded "testimony regarding specific instances of violent conduct."  Ochoa filed a motion asking the trial court to reconsider its decision denying the *McMorris* evidence.  The trial court denied the motion for reconsideration as untimely and for failing to meet the legal standard for reconsideration.

¶4      Ochoa also filed a notice of his intent to present the testimony of ten expert witnesses.[4]  In response, the State filed a motion seeking to exclude seven of Ochoa's expert witnesses because each witness was either irrelevant or unreliable "under the *Daubert*[5] Standard" set forth in WIS. STAT. § 907.02(1), and it later submitted a brief laying out its objections to five of Ochoa's expert witnesses.  After conducting a three-day *Daubert* hearing, the trial court excluded three of Ochoa's

---

[3] *See McMorris v. State*, 58 Wis. 2d 144, 205 N.W.2d 559 (1973).  "Evidence of a victim's violent character and past violent acts is often referred to as *McMorris* evidence." *State v. Head*, 2002 WI 99, ¶24 n.5, 255 Wis. 2d 194, 648 N.W.2d 413.

[4] The ten witnesses were:  (1) Lorrine Edwards; (2) Amy Miles; (3) William Johnson; (4) Michelle Burns; (5) Glenn Hardin; (6) Alfonso Villaseñor; (7) Dr. Phillip Trompetter, Ph.D., ABPP; (8) William Wilson; (9) Conrad Zvara; and (10) Marty Hayes.

[5] *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

proffered expert witnesses—Marty Hayes, Alfonso Villaseñor, and Conrad Zvara—based on concerns about relevance and/or reliability.

¶5     Ochoa's jury trial took place over the course of seventeen days in October 2019.  On days thirteen and fifteen, Ochoa testified in his own defense.  During his testimony, Ochoa described his friendship with his cousin Garcia over the years, including how Garcia allowed Ochoa to live with him in California when Ochoa first moved to the United States from Mexico in 1997 or 1998 and how after visiting Garcia in Oostberg, where Garcia had relocated, Ochoa moved his family to Oostburg in 2011.  Garcia allowed Ochoa's family to live with him in Oostburg for six-to-eight weeks until Ochoa found an apartment.  Ochoa testified that at that time, his relationship with Garcia was "[v]ery good[,]" and they were "more than cousins"—they "were brothers"—and that Garcia was his closest friend.  They continued to have a good relationship when Ochoa moved away from Oostberg for a period of time before ultimately returning to the area.

¶6     Ochoa testified that he asked Garcia to be his son's godfather prior to his son's April 2017 First Communion and that Garcia was "very joyful" about this request.  In March 2017, while Garcia and his family were at Ochoa's house to plan for the First Communion celebration, Ochoa believed Garcia and Lopez, who was also present, were consuming cocaine at his house.  Ochoa, upset because his son almost saw the drug use, asked Garcia and Lopez to leave.  There was no "big argument or fight"—Garcia understood Ochoa's concern, gathered his family, and left.

¶7     Ochoa testified that after the March 2017 incident, he decided to choose a different godfather; however, Ochoa did not have a chance to tell Garcia about the change at that time because Garcia "went to live [in] Milwaukee."  In May

4

2017, Ochoa and Garcia were hanging out together, and Ochoa planned to tell Garcia that a different family member was chosen to be his son's godfather at the April First Communion. However, Ochoa did not get a chance to do so because Garcia was "really sad" and "crying and telling [Ochoa] about this personal problem." Ochoa testified he did not tell Garcia "[b]ecause [Garcia] was really worried about something serious, so compared with what he was facing, [the godfather change] was really insignificant." Ochoa testified his son's First Communion had occurred in April 2017 without Garcia and that after May 2017, he did not see Garcia again until July 2017.

¶8      Ochoa told the jury that on July 29, 2017, his sister and her husband were visiting from Mexico and had brought asthma inhalers from Mexico. At about 10:30 or 11:00 p.m., Ochoa and his brother-in-law went over to Garcia's house to deliver some of the inhalers. Ochoa also brought a bucket of beer and rum as a gift for Garcia. Ochoa, his brother-in-law, Garcia, and Lopez all had a beer together. After about twenty or thirty minutes, Ochoa told Garcia he needed to get back home. Ochoa testified that he went home and slept for about two or three hours and then woke up because he remembered that his cousin Garcia "had been very insistent" about wanting to talk to Ochoa that night. The parties then argued about whether Ochoa could testify about statements Garcia had made to Ochoa that caused him to return to Garcia's home when Ochoa woke up at 2:00 a.m. that morning. Ultimately, the trial court allowed Ochoa to testify about his reason for returning to Garcia's home in the middle of the night.

¶9      Ochoa also told the jury he had recently obtained his concealed carry permit and had grown up learning how to use guns. The jury also learned that Ochoa did not take his gun into Garcia's home when he went there with his brother-in-law, but he did take the gun into the Garcia home when he went back at 2:00 a.m. on July

30th. Ochoa testified this was out of concern about a recent robbery in the area since he was going alone. Ochoa told the jury that when he first arrived at the Garcia home at 2:00 a.m., Garcia and Lopez were happy to see him but that things got heated when they began to argue about Ochoa's decision to not have Garcia as his son's First Communion godfather. Ochoa said Lopez had a pocketknife that he opened and closed "[m]aybe four or five times" and made threats that Ochoa felt meant they were going to kill him. The threats, spoken in Spanish, were interpreted as "you are so screwed," but Ochoa testified that he had interpreted them to be death threats, more like, "I'm going to kill you. You're going to die" or "[y]ou're gonna get screwed."[6]

¶10    Ochoa also testified that he began walking into the kitchen and then looped back through the living room about five times. He then tried to open the back door once but testified Garcia came up behind him with a knife and said he was not leaving. Ochoa walked back to the living room where he felt that he was about to be attacked. Ochoa shot Lopez first and then Garcia when Garcia lunged at him. Ochoa then left the home with the intent to go directly to the police department but did not arrive at the Sheboygan Police Department until about an hour after the shootings. During the drive, Ochoa tossed his gun holster out the window.

¶11    Garcia's son, J.G., was upstairs playing video games with two friends at the time of the shooting. J.G. and his friends heard the shots and got scared. They were afraid to go downstairs in case the shooter was still present, but eventually one

---

[6] The Spanish words were: "Te va a llevar la verga" and "Ya te llevó la verga[.]" In his "Summary of Expert Opinions of Alfonso Villaseñor," one of the excluded experts, Ochoa posited that Villaseñor would testify that these phrases meant "[y]ou're gonna get fucked up" or "[y]ou're fucked, now[.]" Spanish interpreters were utilized throughout the course of the trial.

of J.G.'s friends went out through the window and jumped down to the ground. The friend saw Garcia and Lopez lying on the living room floor, presumably shot to death, and then called J.G. to report what he saw before driving home. J.G. and the remaining friend then went downstairs, and J.G. woke up his uncle who lived with them and had been sleeping in his bedroom located on the main floor of the house. The uncle attempted CPR and called 911 because J.G. had not already done so.

¶12 When EMTs arrived, they determined both Garcia and Lopez were deceased. The Sheboygan Sheriff's Department and Police Department conducted an investigation. They located multiple bullets and multiple casings that were eventually connected to Ochoa's gun. Both Garcia and Lopez were shot multiple times. The police did not find any weapons in the living room at the Garcia home aside from the pocketknife recovered from a pocket in Lopez's cargo shorts.

¶13 When Ochoa arrived at the Sheboygan Police Department, he asked for a Spanish-speaking officer, but one was not immediately available. Ochoa told police that he was "sad" and that he "didn't mean to hurt anybody," that he had done something "bad," and that the gun was in his car. Police impounded Ochoa's car, retrieved the gun, and obtained a search warrant for Ochoa's home. Police recovered additional handguns and ammunition from Ochoa's home.

¶14 After the close of testimony, the trial court determined which jury instructions would be given to the jury. The only jury instruction issue Ochoa raises on appeal is whether the trial court erred in denying his request that pattern jury instruction WIS JI—CRIMINAL 1016 be modified to include language from WIS JI—CRIMINAL 805, which incorporates the definition of "reasonably believes" found in WIS. STAT. § 939.22(32).

¶15 The trial court expressed its preference to use the pattern jury instructions without modifications but explained that if Ochoa's counsel provided it with authority to make the modification to the pattern instruction, it would consider doing so. Ochoa's counsel pointed to the statutory definition of "reasonably believes," but the trial court gave the pattern jury instruction to the jury without adding the modification.

¶16 The jury returned guilty verdicts on the lesser-included crime of first-degree reckless homicide on both counts.[7] The trial court sentenced Ochoa to twelve years and six months' initial confinement followed by five years' extended supervision on each count, to run consecutively for a total of twenty-five years' initial confinement and ten years' extended supervision. Ochoa appeals.

## II. STANDARD OF REVIEW

¶17 Although a trial court's admission or exclusion of evidence is reviewed for an erroneous exercise of discretion, we analyze de novo whether a trial court's exclusion of evidence deprived a defendant in a criminal case of his constitutional right to present a defense. *State v. Wilson*, 2015 WI 48, ¶47, 362 Wis. 2d 193, 864 N.W.2d 52.

¶18 "[A] trial court has wide discretion in instructing the jury based on the facts and circumstances of each case." *State v. Wenger*, 225 Wis. 2d 495, 502, 593

---

[7] The jury was instructed that first-degree reckless homicide requires the jury to find that the defendant caused death by criminally reckless conduct and that "[c]riminally reckless conduct means the conduct created a risk of death or great bodily harm to another person, and the risk of death or great bodily harm was unreasonable and substantial, and the defendant was aware that his conduct created the unreasonable and substantial risk of death or great bodily harm." *See* WIS JI—CRIMINAL 1016. The jury was further instructed that it must find that the defendant acted recklessly "under circumstances which show utter disregard for human life." *Id.* As discussed later, the jury was also instructed on the interplay between these charges and Ochoa's assertion of self-defense.

N.W.2d 467 (Ct. App. 1999). A "trial court has wide discretion in choosing the language of jury instructions and if the instructions given adequately explain the law applicable to the facts, that is sufficient and there is no error in the trial court's refusal to use the specific language requested by the defendant." *State v. Herriges,* 155 Wis. 2d 297, 300, 455 N.W.2d 635 (Ct. App. 1990).

## III.  DISCUSSION

### A.  Constitutional Right to Present a Defense

¶19    Ochoa argues that three evidentiary exclusions violated his constitutional right to present a defense.  He contends the trial court:  (1) should have allowed him to introduce evidence about the victims' prior violent acts; (2) should have allowed him to call three additional expert witnesses; and (3) erred in excluding testimony explaining his reasons for returning to the victim's home in the middle of the night.  Ochoa contends the exclusion of this evidence violated his constitutional right to present a defense under article I, section 7 of the Wisconsin Constitution and the Sixth Amendment of the United States Constitution.[8]

¶20    "Every defendant in a criminal case has the right under the Sixth Amendment to present his or her defense." *State v. Ward*, 2011 WI App 151, ¶16, 337 Wis. 2d 655, 807 N.W.2d 23 (citing *Washington v. Texas*, 388 U.S. 14, 18-19 (1967)).  The right is not absolute, however, as the evidence the defendant seeks to

---

[8]  Article I, section 7 of the Wisconsin Constitution provides as relevant:  "In all criminal prosecutions the accused shall enjoy the right ... to meet the witnesses face to face; [and] to have compulsory process to compel the attendance of witnesses in his behalf[.]"  WIS. CONST. art. I, § 7.

The Sixth Amendment of the United States Constitution provides as relevant:  "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him; [and] to have compulsory process for obtaining witnesses in his favor[.]"  U.S. CONST. amend. VI.

introduce must be relevant. *See **Crane v. Kentucky***, 476 U.S. 683, 689-90 (1986); ***United States v. Valenzuela-Bernal***, 458 U.S. 858, 867 (1982) ("mere absence of testimony" is insufficient to establish constitutional violation; defendant must show the excluded "testimony … would have been *relevant* and *material*, and … *vital* to the defense" (citation omitted; second omission in original)). The admission of evidence is subject to "the application of evidentiary rules that themselves serve the interests of fairness and reliability—even if the defendant would prefer to see that evidence admitted." ***Crane***, 476 U.S. at 690. Trial courts have "'wide latitude' to exclude evidence that is 'repetitive …, only marginally relevant,' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" ***Id.*** at 689-90 (quoting ***Delaware v. Van Arsdall***, 475 U.S. 673, 679 (1986) (alteration and omission in original)). The relevance of the proffered evidence must not be "substantially outweighed by its prejudicial effect." ***State v. Pulizzano***, 155 Wis. 2d 633, 646, 456 N.W.2d 325 (1990). For the reasons explained below, the trial court did not violate Ochoa's constitutional right to present a defense.

### 1. Victims' Prior Acts of Violence—*McMorris* Evidence

¶21 Ochoa's first contention is that the trial court erred in refusing to allow him to introduce evidence about the victims' prior specific acts of violence—namely *McMorris* evidence. As noted, the trial court *did* allow testimony that the victims had a *reputation* for being violent. Our review is therefore limited to whether the exclusion of testimony regarding *specific acts* of violence was error.

¶22 In his motions in limine, Ochoa asked the trial court to allow the *McMorris* evidence if Ochoa chose to testify. Ochoa filed a brief in support of his motion, which specifically asserted that he "wishes to introduce evidence of his

knowledge of prior specific acts of violence committed by" the victims to show that the victims "were the first and primary aggressors." His brief provided the following information about these prior specific acts of violence:

[B]etween the years of 1993 and 1998 or 1999, Mr. Ochoa personally observe[d] approximately three-to-four instances of [Garcia and Lopez] engaging jointly in what he learned to be pre-emptive, violent and brutal attacks against third parties that involved kicking and punching the third parties to the ground during a night of drinking alcohol at Plaza Santa Maria de Torres in their home community in Mexico during rodeo events. During the same period of time and place, Mr. Ochoa personally observed [Garcia] in two-to-three separate instances launch similar style of attacks against third parties. Mr. Ochoa observed third parties, including the relatives of the owners of the Plaza Santa Maria de Torres, Chino Morales, intervene to break up the fights, and red cross workers attend to the injured third parties, whose faces were often cut and who were sometimes left unconscious, after [Garcia and/or Lopez] fled. Mr. Ochoa was aware that [Garcia and Lopez] would provoke the fights by intervening with a male who was dancing with his girlfriend to provoke him to fight, or threw Model beer cans at one or more males. In one instance, Mr. Ochoa recalls that [Garcia] stole a <<chicharra>>, or an electrical wire used to shock bulls that would sometimes be used by those trying to break up fights, and used it to shock the person who he was fighting to inflict additional carnage. Mr. Ochoa would indicate that although other males in his peer group would also pick fights at these types of events, he was aware of [Garcia and Lopez's] reputation for behaving extremely violently and aggressively when drinking. Mr. Ochoa was also aware during the same relevant years that [Garcia and Lopez] would fight with others at annual fiestas, including festivals at San Sebastial el Grande in San Agustin and in Santa Maria in Tlajomulco, as well as Santa Anita in Tlaquepaque. Mr. Ochoa indicates that he was aware that [Garcia and Lopez] would use unconventional weapons such as rocks and broken beer bottles during these fights to inflict maximum carnage. From 1999 through 2017, both [Garcia and Lopez] on various occasions would reminisce in Mr. Ochoa's presence about their violent exploits in Mexico, ganging up and beating people in tandem, as well as fights they had been involved in while living in the United States, including California and Wisconsin. Mr. Ochoa never witnessed any of the fights in the United States, which [Garcia and Lopez] described themselves as having been

11

violent and successfully ganging up on and beating up other individuals in a manner similar to what Mr. Ochoa had personally observed or been told about third hand.

¶23 The State objected to the admission of this *McMorris* evidence, noting it is proper to exclude it when it is too remote, *see McMorris v. State*, 58 Wis. 2d 144, 151, 205 N.W.2d 559 (1973), or if the application of the WIS. STAT. § 904.03 balancing test shows the evidence should be excluded. *See State v. McClaren*, 2009 WI 69, ¶21, 318 Wis. 2d 739, 767 N.W.2d 550 (trial court has the "responsibility to vet the evidence prior to admission to be sure it is valid *McMorris* evidence").

¶24 The State asserted that:

> [E]vidence of the decedent's actions between 1993 and 1997 or 1998 is not relevant given the significant time that elapsed between the dates and the charged offense in 2017. Further, the claimed reminiscing testimony should be denied without more explanation because the court is unable to identify the dates, circumstances, frequency or other indicia of reliability or reasonableness of the offered testimony. Without more information the court is not in a position to evaluate the probative value of the evidence as opposed to its danger of unfair prejudice, nor to evaluate whether the offered testimony would confuse the issues, mislead the jury, delay the case, or waste the jury's time.

In ruling on the *McMorris* motion, the trial court addressed the pertinent case law and relied specifically on *State v. Head*, 2002 WI 99, ¶128, 255 Wis. 2d 194, 648 N.W.2d 413, which held that "[a]dmissibility is not automatic." *Head* provides:

> If the court determines that the [*McMorris*] evidence is relevant, the [trial] court should admit it as it would any other relevant evidence, excluding it only if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." WIS. STAT. § 904.03.

*Head*, 255 Wis. 2d 194, ¶129.

¶25    The trial court then applied the precedential case law to Ochoa's case. It said:

> In this case the defendant wants to introduce three to four instances of [Garcia and Lopez] engaging in preemptive violent attacks against someone else between the years of 1993 and 1998 or '99. He wants to introduce an additional two to three similar acts by [Garcia] alone during that same time period. All of those acts occurred in Mexico during a night of drinking.
>
> And then he further wants to introduce that between 1999 and 2017 both [Garcia and Lopez] would reminisce about ganging up on people in Mexico as well as in the U.S., but the defendant doesn't provide any time frame for the incidents which allegedly occurred in the U.S.

¶26    The trial court then addressed whether the *McMorris* evidence was relevant, specifically "whether the evidence relates to a fact of consequence and whether the other act makes the consequential fact more or less probable." The trial court noted that the case law provides "a way to measure the probative value," which "is to look at the similarity in time, place, and circumstance between the other act and the current incident." The trial court first looked at the three or four specific acts of violence Ochoa claimed he personally observed in Mexico. First, the trial court noted these acts occurred:

- "18 or more years prior to the homicides";

- "in Mexico … in public places, such as rodeos or bars";

- "None of them occurred in private homes or to family members"; and

- "There's no allegation that [Garcia and Lopez] in those prior incidents ever threatened anyone with death or actually used deadly force against anyone."

13

¶27　　The trial court ruled these prior acts of violence were "of questionable probative value" because they were too remote, too dissimilar, and would not "reasonably bear on the defendant's apprehension of danger." Even if these acts were "arguably relevant," the trial court found that "admitting them would be more prejudicial than probative" under WIS. STAT. § 904.03.

¶28　　With respect to admitting evidence about the victims bragging about the specific violent Mexico acts and the alleged similar violent acts occurring in the United States, the trial court found "there are no details provided about time, place, or circumstance. Nor is there any detail about how often or at what intervals these alleged recent attacks occurred." The trial court said that "without that information, there's no way for me to determine the repeated admissions about new assaults remained sufficiently constant over the years as alleged by Mr. Ochoa." Additionally, the trial court found there was insufficient specificity from which "a reasonable jury could find by a preponderance of the evidence that the other acts occurred."

¶29　　We conclude the trial court's decision to exclude the *McMorris* evidence was not erroneous. The trial court considered the applicable law, applied the pertinent facts, and reached a reasonable determination. *See State v. Payano*, 2009 WI 86, ¶51, 320 Wis. 2d 348, 768 N.W.2d 832. The "three or four" Mexico violent acts that Ochoa sought to admit were not relevant for the reasons expressed by the trial court. First, the Mexico acts were too remote from the present act. These were acts by the victims almost twenty years before the homicides—before Ochoa and Garcia moved to the United States and lived together first in California and then in Oostburg where they were raising their families. Ochoa, his wife, and three children moved into (and shared) Garcia's home multiple times, and Ochoa described Garcia as "a brother." Their families were close and celebrated birthdays

together where both Garcia and Ochoa drank, and although Ochoa argues that Garcia's drug use in front of his children distanced them in 2017, for almost twenty years after the Mexico acts purportedly occurred, even Ochoa had no concerns about the "three or four" violent incidents by Garcia and Lopez after these men moved to the United States. Second, the Mexico acts were dissimilar to what transpired the night Ochoa shot Garcia and Lopez. The Mexico events were at public places—not Garcia's home—the targeted subjects were strangers—not family—and there were no threats to kill. The trial court's decision to exclude the Mexico events was reasonable.

¶30    The alleged United States-specific violent acts and Garcia and Lopez's alleged "bragging" were also properly excluded. Ochoa failed to provide any specific information on these acts, and the trial court found that based on the information Ochoa offered, a reasonable jury would not be able to find that those acts occurred. *McMorris* evidence must be relevant and not unduly prejudicial. If the jury had no basis to find the proffered acts occurred, then they could not be relevant. Excluding *McMorris* evidence that was irrelevant does not violate Ochoa's right to present a defense.[9]

---

[9]    Ochoa asserts the trial court's decision does not stand up against the five-factor test set forth in *State v. Pulizzano*, 155 Wis. 2d 633, 656, 456 N.W.2d 325 (1990):

> (1) that the prior acts clearly occurred; (2) that the acts closely resembled those of the present case; (3) that the prior act is clearly relevant to a material issue; (4) that the evidence is necessary to the defendant's case; and (5) that the probative value of the evidence outweighs its prejudicial effect.

*Id.* at 656. The State points out that *Pulizzano* is not specifically a *McMorris* evidence case, but instead addresses the rape shield law. *See Pulizzano*, 155 Wis. 2d at 638. The State is correct. *Pulizzano* does not mention *McMorris* evidence and only addresses the constitutional right to

### 2. Excluded Expert Witnesses

¶31    Ochoa next complains that the trial court violated his right to put on a defense when it excluded three of his expert witnesses: (1) Marty Hayes; (2) Alfonso Villaseñor; and (3) Conrad Zvara. Ochoa asserted that Hayes would offer his opinion about:

> (1) the dynamics of violent encounters, including the risk of an armed defender having his weapon disarmed when he is outflanked; (2) the use of spent cartridge casings and other physical evidence to infer shooter location; and (3) the analysis of the trajectory of bullets, and other ballistic evidence, to infer the manner in which the two deceased individuals were shot.

At the *Daubert* hearing, Hayes testified that he is a firearms expert, he was retained to review the crime scene photos and do a crime scene reconstruction, and that he uses forensic mannequins to determine bullet trajectory. Ochoa indicated that Alfonso Villaseñor "is a certified federal interpreter in Spanish-to-English and English-to-Spanish" and would give his opinion as to the slang meaning of the phrases Lopez used that Ochoa understood to be a death threat. Ochoa filed a summary of Villaseñor's anticipated testimony stating that Villaseñor would testify that "Te va a llevar la verga" best translates to "You're gonna get fucked up" or "You're gonna get fucked" and that Villaseñor would explain that "the speaker's emotion when using the tone can have an affect [sic] on how the listener interprets the phrase, such as whether he or she may be joking or serious." According to

---

present a defense in the context of "excluded evidence of a child complainant's prior sexual conduct for the limited purpose of proving an alternative source for sexual knowledge[.]" *Pulizzano*, 155 Wis. 2d at 656. Even if we applied the *Pulizzano* test, we would still uphold the trial court's rulings. The Mexico acts do not "closely resemble[] those of the present case[,]" and the prejudice of admitting such testimony outweighs the probative value. *See id.* The alleged acts in the United States and the "bragging" likewise do not satisfy the *Pulizzano* factors because there was insufficient information to show that the prior acts clearly occurred. *See id.*

Ochoa, Conrad Zvara "is a retired Lieutenant of the Milwaukee Police Department and Captain in the United States Coast Guard who is a certified Self-Defense and Deadly Force instructor." Ochoa indicated that Zvara planned to testify about the use of deadly force and help the jury assess the reasonableness of Ochoa's actions given the circumstances in the Garcia living room at the time of the shooting. Zvara testified at the *Daubert* hearing that he relied on "some of the opinions" in other "defense expert reports," including Hayes's, to write his report.

¶32 In determining whether the exclusion of a defendant's expert witness violated his constitutional right to present a defense, our supreme court has established a two-part inquiry. *See* *State v. St. George*, 2002 WI 50, ¶53, 252 Wis. 2d 499, 643 N.W.2d 777. The first part requires that the defendant satisfy four factors: (1) the expert's testimony must meet the standards of WIS. STAT. § 907.02; (2) the testimony must be "clearly relevant to a material issue"; (3) the testimony must be "necessary to the defendant's case"; and (4) "[t]he probative value of the testimony of the defendant's expert witness outweigh[s] its prejudicial effect." *St. George*, 252 Wis. 2d 499, ¶54. If the four factors of the first part are satisfied, then the court moves on to the second part of the inquiry, namely "whether the defendant's right to present the proffered evidence is nonetheless outweighed by the State's compelling interest to exclude the evidence." *Id.*, ¶55. "[W]hether to admit proffered expert testimony" "is within the [trial] court's discretion[.]" *State v. Dobbs*, 2020 WI 64, ¶27, 392 Wis. 2d 505, 945 N.W.2d 609. If the trial court's decision "'had a reasonable basis' and 'was made in accordance with accepted legal standards and in accordance with the facts of record[,]'" we will not reverse the trial court's decision. *Id.* (citation omitted). The trial court excluded these three witnesses under § 907.02—the first factor of the first part of the *St. George* inquiry.

17

Because we conclude the trial court's decision was proper on that basis, we need only address the first factor of part one of the ***St. George*** inquiry.

¶33    After the ***Daubert*** hearings, the trial court rendered an oral decision excluding Hayes, Villaseñor, and Zvara under the first ***St. George*** factor because these three experts did not meet the standards of WIS. STAT. § 907.02.  Section 907.02(1) provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if the testimony is based upon sufficient facts or data, the testimony is the product of reliable principles and methods, and the witness has applied the principles and methods reliably to the facts of the case.

The trial court acknowledged that its role is to act as "a gatekeeper" to determine whether the expert testimony is both reliable and relevant.  It noted that "a trial judge is to determine whether an expert is proposing to testify to scientific knowledge that will assist the trier of fact to understand or determine a fact of issue, whether the reasoning or methodology underlying the testimony is scientifically valid, and whether the reasoning or methodology can be applied to the facts in issue."

¶34    The trial court explained why it was excluding Hayes.  First, it "had some real concerns about the basis of his opinions."  Although Hayes had "some experience as a former member of law enforcement," it was "very dated" and "didn't involve analysis of crime scenes to the degree he's being called -- would be called to testify in this case."  Second, the trial court had concerns that Hayes did not have sufficient education to offer opinions about "crime scene reconstruction, forensic pathology, or the movement of bullets in the human body," as he based "a lot of his conclusions on his own experiments firing weapons and using mannequins and rods

18

to trace the trajectory of the bullets." The trial court saw this as "troubling" "because mannequins don't have bone that can change the trajectory of bullets" and because "people's bodies may be moving as they're being shot, unlike a mannequin's, which is stationary." It concluded that Hayes's methodology was unreliable because "comparing how a bullet travels through a mannequin versus a human body" is "vastly different. It's comparing apples to oranges."

¶35 The trial court's decision as to Hayes was not erroneous because it reached a reasonable determination after considering the specific facts and applying the correct law. It had valid concerns about the reliability of Hayes's opinions and acted within its gatekeeper function to exclude this witness.

¶36 In addressing Villaseñor, the trial court explained that it found his testimony to be irrelevant. It reasoned:

> There's no need for an expert to testify about meanings of words or phrases because the only person the meaning mattered to was Mr. Ochoa [who] was the hearer of those statements. So it's also excluded on relevance grounds.
>
> I know the defense argued that it would help establish Mr. Ochoa's credibility if it re-enforced -- if this witness re-enforced Mr. Ochoa's perceptions of the words that were used. But I don't think that's necessarily true because it would require the jury to believe Mr. Ochoa was reciting the words accurately. So they're going to need to believe Mr. Ochoa one way or the other anyway. And if they believe him, then they'll believe his take on those words. So I just don't think it's relevant. I think it would be cumulative, and it's not necessary.

¶37 Excluding Villaseñor under WIS. STAT. § 907.02 as irrelevant was a reasonable decision by the trial court. No one except Ochoa knew exactly what Lopez said that night, and no one except Ochoa knew the tone or context of those statements. The only relevance of the slang translation was what Ochoa understood

19

the phrase to mean. Ochoa told the jury what the phrase Lopez used meant to him: "With the tone of voice and the manner of which he was saying it, it was like a threat to me. He said -- he was telling me I'm going to kill you. You're going to die." The jury is charged with assessing credibility. It could have chosen to believe Ochoa's account of what happened. And if the jury believed Ochoa's account, it had no reason to doubt Ochoa's testimony about the meaning of Lopez's statements. Presenting Villaseñor's translation would have been a waste of time and potentially created confusion. Moreover, the words "You're gonna get fucked up" or "You're gonna get fucked" do not necessarily equate to "I'm going to kill you" or "You're going to die"—further supporting the trial court's exclusion as reasonable.

¶38    The trial court made the decision to exclude Zvara's testimony because it was "based in part on information from Mr. Hayes," which it had already found to be unreliable. It therefore concluded that Zvara's opinions based on that information would likewise be unreliable. In addition, the trial court found Zvara's opinions to be irrelevant: "Mr. Zvara's observations aren't relevant to those of the defendant and whether he was reasonable in his thoughts and actions. The jury needs to consider the defendant's thoughts and actions. So testimony about typical use of force situations just isn't relevant. So I'm going to exclude his testimony on those grounds."

¶39    The trial court's decision on Zvara was reasonable. Zvara's testimony relied on Hayes's opinion, which was excluded as unreliable. It logically follows that any opinion Zvara formed based on Hayes's opinion is also unreliable. As for Zvara's testimony that did *not* rely on Hayes's opinion, the trial court saw it as irrelevant. Zvara focused on use-of-force principles. Here, the jury was tasked with assessing whether Ochoa's thoughts and actions were reasonable. The trial court acted reasonably in excluding testimony it found to be both unreliable and

irrelevant. As noted, it had "wide latitude to exclude evidence that is repetitive …, only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the issues." *Crane*, 476 U.S. at 689-90 (alteration and omission in original; citation and internal marks omitted).

¶40 In summary, the trial court's determination that three of Ochoa's expert witnesses did not meet the standard under WIS. STAT. § 907.02(1) was not erroneous, and Ochoa has therefore failed to establish their exclusion was a violation of his constitutional right to present a defense.

3. Reason-for-Returning Testimony

¶41 Ochoa also argues that the trial court improperly prohibited him from testifying about the *reason* he returned to Garcia's home when he awoke during the middle of the night. Specifically, Ochoa wanted to tell the jury that Garcia made statements asking Ochoa to return that night to talk about something important and that it needed to be that night because Garcia was leaving for Milwaukee the next day and did not know when he would be returning to Oostburg. Although the admissibility of Garcia's statements to Ochoa that prompted Ochoa's return that night was the subject of much debate, the record demonstrates that although the trial court did not allow Ochoa to testify as to the specific *content* of Garcia's request, it nevertheless allowed Ochoa to explain that he returned to Garcia's house in the middle of the night specifically because Garcia had asked him to return to talk about something important that night because Garcia was leaving for Milwaukee the next day. We set forth exactly what the record reflects.

¶42 Ochoa testified that after returning home from his first visit to Garcia's house that evening, he slept for about two or three hours and then woke up because he remembered that his cousin, Garcia, "had been very insistent" about

21

something. At that point, the prosecutor objected on hearsay grounds, and after a sidebar, the trial court sent the jury out of the courtroom. The trial court recounted the sidebar discussion for the record, explaining that the defense "wanted to introduce testimony of what the decedent, Luis Garcia, had said that led Mr. Ochoa to return to the house that evening in the middle of the night or the middle of the morning, early morning."

¶43     Ochoa's trial lawyer argued that "the jury is entitled to hear the actual account of the person who was there and understand the reason why he returned to the house[.]" The defense wanted to offer something to dispel the inference that Ochoa "had some kind of intent to kill based on using a firearm and having it with him and going back to a house late at night." In response to the prosecutor's concern that testimony about what Garcia said would be inadmissible hearsay if offered for the truth of the matter asserted, Ochoa's trial lawyer argued that Ochoa had a constitutional right "to explain his intent and motive, to explain the background why that statement had an effect on him, enough to get him out of bed in the middle of the night[.]"

¶44     The trial court did not make an immediate decision because it wanted to research the issue. After considering relevant case law, the trial court ruled that *Ochoa could testify about his reason for returning to Garcia's home* in the middle of the night. Specifically, the trial court concluded Ochoa could testify: "that when he left the house, he was under the impression that Luis Garcia wanted him to return that evening, later that evening. And he can certainly testify to his own statement that he said he would if he could." The trial court explained:

> I am not trying to limit his defense. I am trying to follow the law to the best of my ability, which is why I think it is fair to allow some explanation of why he returned, but the entirety of the conversation is nothing that the jury needs to hear. For

22

you to present a complete defense, the jury needs to know that your client was under the impression that Luis Garcia wanted him to come back that evening and that he said he wouldn't be.

The trial court added:

And the other thing I just wanted to put on the record regarding my decision on what can come out about why Mr. Ochoa returned to the residence, is that he could have gone over there for any number of reasons, none of which involved the intent to commit a homicide.

What happened after he got there, I think, as I already said, that would be relevant, but going over even at the victim's insistence isn't in my opinion relevant, because there are too many interceding possibilities for the intent to commit a homicide to form after that to come into play.

¶45    Ochoa filed a motion to reconsider the trial court's decision on what Ochoa could testify to regarding Garcia's statement instructing Ochoa to "come back" to Garcia's home the night of the shooting. In addressing Ochoa's reconsideration motion, the court clarified its ruling:

Most of my decision was based on the *Wilson*[10] case and the *Nieves*[11] case and how I perceive these statements. I'm having difficulty understanding why the defense keeps asserting that I'm not allowing the defendant to testify to the effect of these statements on him because I've already said that he can certainly testify that he was under the impression that he was to come back.

He can certainly testify as to Luis Garcia's demeanor, that he seemed upset or that he seemed however his demeanor appeared because that's not hearsay. He can certainly testify to his own statements. So I don't understand where the defense is coming from when they're saying I'm denying the

_____

[10] *State v. Wilson*, 160 Wis. 2d 774, 777, 467 N.W.2d 130 (Ct. App. 1991) (a court may properly admit statements, not for their truth, but rather to show their effect on the listener's state of mind).

[11] *State v. Nieves*, No. 2014AP1623-CR, unpublished slip op. (Apr. 5, 2016), *rev'd*, 2017 WI 69, 376 Wis. 2d 300, 897 N.W.2d 363.

23

defendant the ability to fully present his defense or to present that part of the defense.

What I'm trying to do is comply with the law as I understand it on hearsay. I don't know that the specific statement by the defendant has actually -- that the defendant wants to offer that Luis Garcia made was ever specifically imparted to me. What it says in the motion is that the statement is come back, cousin. If that's the statement, I think that he can testify to that as to effect on listener, come back, cousin. But to get into all the extra stuff, the discussion about plans, et cetera, I think that would be a violation of the hearsay rule for the reasons I already went into yesterday.

¶46    When Ochoa resumed his direct testimony, the following exchange occurred between Ochoa and his trial counsel:

Q    We talked about during the night you woke up during the middle of the night because you were worried about something?

A    Yes.

Q    What were you worried about?

A    Well, because of my cousin Luis. Hours prior he had insisted that I go to his house because he wanted to talk about something with me.

¶47    After Ochoa's answer, the prosecutor interrupted, stating: "Judge, the State previously objected to hearsay." Although the trial court responded by asking Ochoa's trial lawyer if he "need[ed] clarification on the decision[,]" the trial court did not ultimately rule on the objection or strike Ochoa's answer. Defense counsel continued questioning Ochoa:

Q    Sergio, did Luis tell you, cousin, come over to my house?

A    Yes. He insisted that I go back to him. And I was under the impression that he had something really important to tell me.

> Q     Do you remember what time he insisted to you to come back or where you were when he was with you?

This drew another objection from the prosecutor as to "the first part of that multipart question." The trial court sustained the objection but did not direct the jury to disregard any part of the question or the previous answer. The jury then heard the following exchange:

> Q     Where was Luis when he told you to come back?
>
> A     We were at his house the first time that I went with him.
>
> Q     And when you saw him, without saying more about what he said to you, what kind of demeanor did he have at the time? Was he joking, serious?
>
> A     Well, when he insisted me to go back later, he was being serious.
>
> Q     When you woke up in the middle of the night, why did it bother you so much that he said come back to the house?
>
> A     I thought that he had something really important to tell me.

The trial court then sustained an objection to defense counsel's question about whether Ochoa "[knew] why [Garcia] wanted [him] to come back to the house[,]" but the trial court allowed the following:

> Q     Without using any words about what Luis has previously said, had you ever seen your cousin make a request with that type of serious demeanor before?
>
> A     No. I have never seen him.
>
> Q     Were you able to go back to sleep after you woke up?
>
> A     After? No.
>
> Q     What did you do?

A        I got dressed.  I got out of my house and got going to [Garcia's] house.

¶48     During re-direct, Ochoa testified that Garcia wanted him to return to his house that night because he (Garcia) "said that he wanted to talk with me because the next day very early he was going back to Milwaukee" and that "he was gonna be there for two or three weeks."  Ochoa also testified that Garcia did not live in Oostburg anymore because he had moved to Milwaukee for work.[12]

¶49     Thus, although the jury did not hear what Garcia specifically said, the statements that Ochoa asserts were erroneously excluded were not actually excluded.[13]  The jury heard the reason why Ochoa returned to Garcia's house in the middle of the night and that Garcia had insisted that Ochoa come back that night before Garcia left for Milwaukee.  Accordingly, we cannot conclude that the trial court's rulings in this regard violated Ochoa's constitutional right to present a defense.

*B. Jury Instruction*

¶50     Ochoa's final contention is that an error in the jury instructions warrants a new trial.  Specifically, he argues the trial court erroneously exercised its discretion when it failed to modify WIS JI—CRIMINAL 1016 to include WIS. STAT. § 939.22(32)'s definition of "reasonably believes[.]"  Ochoa points out that while

---

[12]  According to other testimony, Garcia "stayed" in Milwaukee during the week for his job but came home to Oostburg on the weekends.

[13]  Ochoa does not develop any argument that what Garcia wanted to discuss was relevant, nor does he provide substantive information as to what was allegedly erroneously excluded.  In any event, as the State points out, Ochoa later testified that they discussed why Ochoa had not visited Garcia and why Ochoa did not want Garcia to be the godfather to his son.

the definition of "reasonably believes" is present in WIS JI—CRIMINAL 805, the definition is absent from WIS JI—CRIMINAL 1016.

¶51    As relevant here, Wisconsin law provides the following as to self-defense:

> A person is privileged to threaten or intentionally use force against another for the purpose of preventing or terminating what the person *reasonably believes* to be an unlawful interference with his or her person by such other person. The actor may intentionally use only such force or threat thereof as the actor *reasonably believes* is necessary to prevent or terminate the interference. The actor may not intentionally use force which is intended or likely to cause death or great bodily harm unless the actor *reasonably believes* that such force is necessary to prevent imminent death or great bodily harm to himself or herself.

WIS. STAT. § 939.48(1) (emphases added). WISCONSIN STAT. § 939.22 defines "words and phrases" as used in WIS. STAT. chs. 939 to 948 and 951, and subsection (32) provides: "'Reasonably believes' means that the actor believes that a certain fact situation exists and such belief under the circumstances is reasonable even though erroneous." Sec. 939.22(32).

¶52    WISCONSIN JI—CRIMINAL 1016 is the pattern jury instruction used in a case such as this involving first-degree intentional homicide, second-degree intentional homicide, first-degree reckless homicide, and self-defense. *See* WIS JI—CRIMINAL 1016 cmt. i. ("This instruction is for a case where first degree intentional homicide is charged, there is evidence that the defendant acted in self-defense, and the lesser included offenses of second degree intentional homicide and first degree reckless homicide are to be submitted to the jury."). WISCONSIN JI—CRIMINAL 805 is the general self-defense instruction and provides as relevant:

> *A belief may be reasonable even though mistaken.* In determining whether the defendant's beliefs were

reasonable, the standard is what a person of ordinary intelligence and prudence would have believed in the defendant's position under the circumstances that existed at the time of the alleged offense. The reasonableness of the defendant's beliefs must be determined from the standpoint of the defendant at the time of the defendant's acts and not from the viewpoint of the jury now.

(Emphasis added; footnotes omitted.)

¶53 Because this case involved the charged first-degree intentional homicides, the lesser-included offenses of second-degree intentional homicide and first-degree reckless homicide, and Ochoa's claim that he acted in self-defense, the State requested WIS JI—CRIMINAL 1016 because it instructs the jury on the elements of the charged crime (first-degree intentional homicide) and its relationship to the two lesser-included offenses (second-degree intentional homicide and first-degree reckless homicide). This instruction also explains the self-defense privilege and sets forth how self-defense applies to each of these three homicide offenses. Ochoa proposed modifying WIS JI—CRIMINAL 1016 to include the portion of WIS JI—CRIMINAL 805 instructing the jury that "[a] belief may be reasonable even though mistaken."

¶54 The trial court considered both positions before deciding how to instruct on the lesser-included offenses. It "looked at the proposed language that was submitted by both parties" and concluded that "if the lesser included is requested, my inclination would be to follow" the pattern instruction, WIS JI—CRIMINAL 1016, as requested by the State, "because I think it does most closely match the statutes and the case law." The trial court also expressed that it was "always leery to use any sort of instruction that is drafted by either party as opposed to being a pattern instruction" because "[t]he pattern instructions have been very well vetted."

28

¶55     At the final jury instruction conference, the State argued the evidence supported instructing the jury on the lesser-included offenses of second-degree intentional homicide and first-degree reckless homicide and therefore requested the pattern jury instruction WIS JI—CRIMINAL 1016 because it addressed the original charge, the lesser-included crimes, and self-defense.  Ochoa objected to instructing on the lesser-included crimes and proposed a modification of the pattern jury instruction to include WIS. STAT. § 939.22(32)'s definition of "reasonably believes" as set forth in WIS JI—CRIMINAL 805 ("A belief may be reasonable even though mistaken.").

¶56     The trial court agreed the evidence supported submitting the lesser-included crimes to the jury.  The State also argued against Ochoa's request for an instruction that added a definition of "reasonably believes":

> As far as the language of the instruction that would be necessary, I have offered to the Court the pattern instruction. The Court's observation about using pattern instructions because they have been vetted is very appropriate.  The instruction combines the three offenses with self-defense, and I think it does an excellent job of being clear as to how the jury is to consider self-defense and the definition of self-defense for these offenses.
>
> I do not see, much like the pattern instructions have not seen the need, to add additional language including that which the defense is offering.  So I ask that you read the standard pattern instruction for the offenses as drafted by the instruction committee.

Ochoa's lawyer responded:

> The language that has been requested to be added is actually language that comes from a different pattern instruction.  I think that when you look at what the law requires, you look at the two statutory definitions; first, the affirmative privilege of self-defense talking about what reasonable beliefs mean under those circumstances and specifically the statutory defined meaning by the legislature.

29

And that was incorporated for some reason into 805 but not into I believe it's 1016. This is a substantive part of self-defense whether there was a mistake. There's been testimony on that particularly from Dr. Trompetter that a portion of cases of legitimate self-defense can be mistake, can be mistaken beliefs of the actor. There is no reason other than to undermine someone's rights to keep out language that's statutory, not by a drafting committee, but that came directly from the legislature.

So our position is that the Court should follow what the legislative statutory language proscribes when presenting to the jury as fact finder what they need to do to understand that key term, reasonable belief. And part of that definition is that that belief can be reasonable albeit mistaken. There is only prejudice to someone to take away a portion of the definition that relates to their rights for no good reason in terms of prejudice to the other party.

I think that is a compelling reason to follow the statute and not to follow what was done by a drafting committee in this very long instruction and change what they previously did that undermines and omits the statutory definition that the Court and all the parties turn to when there's any ambiguity about an operational phrase on a key issue such as self-defense.

¶57 The trial court asked Ochoa's lawyer if he had "any case law to support that because self-defense … is commonly used as a defense to homicide" and noted that the modification Ochoa was requesting had not been added to WIS JI—CRIMINAL 1016. Ochoa's lawyer responded that "the plain language of the statute speaks for itself" but that he would nevertheless "try and pull up additional case law that stands for that proposition in the context of self-defense." The trial court replied: "All right. If you can provide any case law, I'll take a look at that. Otherwise my inclination is not to change the pattern instruction."

¶58 After addressing other jury instructions, the trial court returned to WIS JI—CRIMINAL 1016 and indicated it would accept 1016 "absent any case law in support of defense's argument." Ochoa's counsel responded that they were "still looking for that. There's only one case that talks about the instruction on self-

30

defense being inappropriate, so we're reviewing that." The trial court eventually adjourned the jury instruction conference and advised the parties that "it's going to take some time for my judicial assistant to try and assemble these packets. Hopefully we can clean up any last-minute issues at that point. Anything else from anybody?" Ochoa's lawyer said he was "just going to keep looking at case law on the issue of why the statutory language should be incorporated" and that he would "let the Court know" if he found anything. Nothing was submitted, and the trial court charged the jury with the pattern instruction WIS JI—CRIMINAL 1016.

¶59 "A trial court has broad discretion in instructing a jury but must exercise that discretion in order to fully and fairly inform the jury of the applicable rules of law." *State v. Ellington*, 2005 WI App 243, ¶7, 288 Wis. 2d 264, 707 N.W.2d 907. "A circuit court properly exercises its discretion when it fully and fairly informs the jury of the law that applies to the charges for which a defendant is tried." *State v. Ferguson*, 2009 WI 50, ¶9, 317 Wis. 2d 586, 767 N.W.2d 187. "The purpose of a jury instruction is to fully and fairly inform the jury of a rule or principle of law applicable to a particular case." *State v. Hubbard*, 2008 WI 92, ¶26, 313 Wis. 2d 1, 752 N.W.2d 839 (citation omitted). Whether an instruction is supported by the underlying facts is a legal question we review independently. *Ferguson*, 317 Wis. 2d 586, ¶9. In reviewing a challenge to jury instructions, we must view the instructions "'in the context of the overall charge.'" *Ellington*, 288 Wis. 2d 264, ¶7 (citation omitted). "Relief is not warranted unless the court is 'persuaded that the instructions, *when viewed as a whole*, misstated the law or misdirected the jury.'" *Id.* (emphasis added).

¶60 Here, the trial court chose to give the pattern jury instruction that specifically applies to the homicide crimes and self-defense assertions at issue here. *See* WIS JI—CRIMINAL 1016, cmt. i. It is unclear why WIS. STAT. § 939.22(32)'s

definition of "reasonably believes" was added to WIS JI—CRIMINAL 805 but omitted from WIS JI—CRIMINAL 1016. What is clear, however, is that the trial court's decision to give the pattern instruction was not an erroneous exercise of discretion because this instruction, *as a whole*, provided the jury with an accurate instruction as to the law of self-defense under the facts of this case.

¶61 As set forth above, the statutory definition provides that "[r]easonably believes" means that the "actor believes that a certain fact situation exists and such belief under the circumstances is reasonable even though erroneous." WIS. STAT. § 939.22(32). As the State points out in its Response brief, Ochoa did not provide the trial court with any *fact situation* about which Ochoa claimed he had an erroneous or mistaken belief that would make the modification applicable, nor did he do so in his Appellant's brief. It is only in his Reply brief that Ochoa points to *possible* mistaken perceptions that he could have had, but his hypothetical examples are devoid of any cite to the record identifying a fact about which he was mistaken, either that he provided to the trial court or to this court on appeal. As the party requesting it, Ochoa had the burden of production to show that the modification was appropriate in the context of the facts of the case. *See State v. Pettit*, 171 Wis. 2d 627, 640, 492 N.W.2d 633 (Ct. App. 1992). He failed to do so.

¶62 As noted, even on appeal, Ochoa has not identified a mistake of fact relating to his alleged belief in an unlawful interference with his person by the others, a mistake of fact relating to his alleged belief that his actions were necessary to prevent or terminate the interference, or a mistake of fact relating to his alleged belief that the force used was necessary to prevent imminent death or great bodily

harm to himself.[14] This is not a case, for example, in which a defendant testified to a mistaken belief that a victim held a gun when she did not.

¶63 Thus, since there was no identified mistake of fact, the instruction would have had no effect on the jury's deliberation. Thus, it is clear that an additional jury instruction advising the jury that a belief can be reasonable even if mistaken would not have changed the outcome. *See State v. Langlois*, 2018 WI 73, ¶48, 382 Wis. 2d 414, 913 N.W.2d 812 (an erroneous jury instruction warrants reversal only when the error is prejudicial).

¶64 As it stands, Ochoa's examples of "mistaken" beliefs are not based on mistakes of fact, but rather, present questions about whether his perception of the

---

[14] Ochoa sets forth hypothetical examples based on arguments the State made in its closing argument. For example, Ochoa argues he could have been mistaken about the need to return to Garcia's home that evening. Even if this somehow relates to his beliefs relating to the danger posed or his use of force, Ochoa did not testify that he was mistaken about the need to return; rather, he emphasized his belief about his need to return and indicated no uncertainty about his cousin's insistence. He also testified that he could not leave because Garcia was behind him with a knife, and he could not open the back door. However, these examples present issues of fact, and his conclusion that he was in danger is based on these facts. But there is no mistaken fact identified, such as for example, that he could not open the door because it was locked when it actually was not or that Garcia was behind him when he actually was not. His testimony that the door handle spun and was "tricky to open" was undisputed, as was his testimony about Garcia's location.

As another example, Ochoa contends he could have made a mistake of fact as to where Lopez's knife was or whether Lopez was reaching for a knife. But at trial, Ochoa testified that he took out his gun and shot Lopez when Lopez reached toward his waist as though he were going to draw a weapon. Ochoa never suggested that he was mistaken about Lopez's movement, and he argued that it was *Lopez* who was mistaken about where the knife was (counsel argued to the jury that Ochoa testified that Lopez reached toward his left pocket when it was ultimately found to be in his right pocket). In short, Ochoa did not testify that he was factually mistaken. These are issues of credibility and Ochoa's denial that his perception of the danger was unreasonable. Again, he has not identified any mistake of fact that factored into that analysis.

danger was reasonable. To that end, the jury heard the following proper instructions, given the facts of this case:[15]

- "The Criminal Code of Wisconsin provides that a person is privileged to intentionally use force against another for the purpose of preventing or terminating what he reasonably believes to be an unlawful interference with his person by the other person. However, he may intentionally use only such force as he reasonably believes is necessary to prevent or terminate the interference. He may not intentionally use force which is intended or likely to cause death unless he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself."

- That Ochoa was "not guilty of any homicide offense" if he "reasonably believed that he was preventing or terminating an unlawful interference with his person and reasonably believed the force used was necessary to prevent imminent death or great bodily harm to himself."

- That "[t]he reasonableness of the defendant's belief must be determined from the standpoint of the defendant at the time of his acts and not from the viewpoint of the jury now" and that "[t]he standard is what a person of ordinary intelligence and prudence would have believed in the position of the defendant under the circumstances existing at the time of the alleged offense."

- How to consider the applicability of self-defense as it related to each charge (first-degree intentional homicide, second-degree intentional homicide, and first-degree reckless homicide).

- That in regard to first-degree reckless homicide, it should "consider the evidence relating to self-defense in deciding whether the defendant's conduct created an unreasonable risk to another" and that if a defendant acts "lawfully in self-defense, his conduct did not create an unreasonable risk to another."

- That it is the State's burden to "prove beyond a reasonable doubt that the defendant did not act lawfully in self-defense" and that the jury "must be satisfied beyond a reasonable

---

[15] For the purpose of brevity, we set forth only select parts of WIS JI—CRIMINAL 1016. The trial court read this entire instruction to the jury.

doubt from *all the evidence* in the case that the risk was unreasonable." (Emphasis added.)

¶65 In summary, under the facts of this case the jury properly heard that self-defense must be based on a reasonable belief, that whether Ochoa's belief was reasonable as to self-defense must be considered from the perspective of an ordinary, reasonable person in Ochoa's position at the time of the offense, and how the self-defense privilege specifically applied to the charged and lesser-included offenses. When viewed as a whole, and under the facts of this case, the instruction given is in accord with the self-defense privilege codified in WIS. STAT. § 939.48(1). Moreover, in addition to instructing the jury as to the circumstances in which the self-defense privilege applies, the instruction it heard also accurately stated the law of self-defense as it relates to first-degree intentional homicide, second-degree intentional homicide, first-degree reckless homicide, and self-defense.

## IV. CONCLUSION

¶66 The trial court's evidentiary rulings did not violate Ochoa's constitutional right to present a defense. The right to present a defense is not absolute and may be constrained by evidentiary rules that "serve the interests of fairness and reliability—even if the defendant would prefer to see that evidence admitted." *Crane*, 476 U.S. at 690. Likewise, the trial court's decision to give the pattern jury instruction specifically applicable to the circumstances of this case did not constitute an erroneous exercise of discretion.

*By the Court.*—Judgment affirmed.